[No. G021061. Fourth Dist., Div. Three. Mar. 15, 2000.]

LEVI BOICOURT, Plaintiff and Appellant, v.
AMEX ASSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Jeffrey C. Metzger and Wylie A. Aitken for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold, Donna D. Melby and Jordon E. Harriman for Defendant and Respondent.

## OPINION

**SILLS, P. J.**—No less an authority on insurance law than John Alan Appleman declared 40 years ago that a liability insurer " 'is playing with fire' " when it refuses to disclose policy limits. Such a refusal " 'cuts off the possibility of receiving an offer within the policy limits' " by the company's " 'refusal to open the door to reasonable negotiations.' " (See *Johanek v. Aberle* (D.Mont. 1961) 27 F.R.D. 272, 280, quoting Appleman, *Circumstances Creating Excess Liability*, appearing in the 1960 proceedings of the Section of Insurance, Negligence and Compensation Law of the American Bar Association, p. 315.)

■ The present case involves another insurer who, at least allegedly, played with fire in refusing to disclose policy limits. Actually, because California law is quite clear that insurers may not disclose policy limits absent written permission from the insured,[1] the insurer's sin here was a blanket refusal to contact the insured to see if he wanted the policy limits disclosed. But functionally it was the same thing. The insurer's refusal to disclose (or in California, the refusal to give the insured the option of disclosing) policy limits may have foreclosed a possible settlement of the underlying claim within those limits.

A blanket rule against precomplaint disclosure of policy limits creates a conflict of interest between liability insurers and their insureds. First, the insurer saves some money on administrative costs by never having to contact its policyholders to obtain the necessary authorization for disclosure. Second, the insurer gains a tactical advantage vis-à-vis the claimant by forcing the claimant to make any prelitigation offers "in the dark." Because the essence of bad faith in the liability insurance context is the insurer's elevation of its own parochial interests over the insured's at the *expense* of a policy limits settlement—that is, preferring its own interests over the insured's when there is a conflict of interest between them—we reverse the summary judgment in this case. That judgment was based on the idea that there could be no conflict of interest absent a formal settlement offer.

### FACTS

On October 27, 1990, then 15-year-old Levi Boicourt was a passenger riding on the freeway in a 1967 Volkswagen Beetle driven by his 16-year-old friend Michael George Dean Belcher, when another Volkswagen—whose driver allegedly wanted to race—swerved into Belcher's path, causing Belcher's car to overturn. Boicourt suffered catastrophic injuries. Two

---

[1]See Insurance Code section 791.13, subdivision (a); see also *Griffith v. State Farm Mut. Auto. Ins. Co.* (1991) 230 Cal.App.3d 59, 65-68 [281 Cal.Rptr. 165].

months later, on December 17, 1990, and prior to filing any litigation against Boicourt's friend (or the friend's father, Michael Howard Belcher), Boicourt's attorney, James J. DiCesare, wrote to the adjusting firm hired by the father's insurer, Amex Assurance Company. DiCesare requested "written confirmation of your insured's applicable policy limits."

On January 22, 1991, a month after the request, an adjuster wrote to DiCesare to state that the company had a "policy not to disclose the amount of the policy limits." DiCesare would later say, in a declaration filed in opposition to a summary judgment motion, that he would have accepted the (subsequently revealed) $100,000 policy limits "on any date up to and including, January 22, 1991, when I was made aware that the policy limits would not be disclosed absent formal litigation."

Four months went by. Then, on May 28, 1991, DiCesare wrote to send the adjuster information about the extent of his client's injuries, confirming the insurer's refusal to disclose the policy limits, and declared that "[b]ut for" the insurer's "actions," the "matter" might "otherwise have been resolved without formal litigation . . . ." A complaint was filed that very day.

Five months into the litigation—on October 28, 1991—Amex made a settlement limits offer of $100,000, presumably by then having disclosed the limits. That offer was refused.

No settlement demand was ever made by DiCesare or anyone else on behalf of Boicourt during the next three and a half years. The case came to trial in December 1994, resulting in a stipulated judgment of $2,985,000 against Belcher the son, and $15,000 against Belcher the father, as owner. Amex paid its policy limit of $100,000. Belcher the son assigned his rights against Amex to Boicourt in return for a contract not to execute on the judgment. In December 1995, Boicourt filed this lawsuit against Amex for bad faith. Amex brought a successful summary judgment motion in October 1996.

## DISCUSSION

### I

We need not rehash the well-settled rules of bad faith liability for the refusal of a liability insurer to settle a case, if the opportunity arises, within policy limits when it ultimately results in a judgment in excess of the policy limits against the insured. Suffice to say for now that the relevance of disclosure of policy limits to the *settlement* of an underlying claim cannot be gainsaid.

Early on, our Supreme Court held that insurance policies (and, by extension, the limits set forth in them) were the proper subject of discovery. (*Superior Ins. Co. v. Superior Court* (1951) 37 Cal.2d 749 [235 P.2d 833].) Among other things the high court noted that "knowledge of low policy limits" could benefit defendants (that is, policyholders) because that knowledge would tend "to discourage a seriously injured plaintiff from holding out for a settlement commensurate with the extent of the injuries." (*Id.* at p. 755.)

Along these lines, any number of jurisdictions have stressed the relationship between the disclosure of policy limits and settlement in the context of discovery. (See *Johanek, v. Aberle supra,* 27 F.R.D. at p. 278 [" 'Such knowledge, furthermore, would also lead to more purposeful discussions of settlement, and thereby effectuate the dispatch of court business' "]; *Kunkel v. United Security Ins. Co. of New Jersey* (1969) 84 S.D. 116 [168 N.W.2d 723, 731] [despite lack of affirmative duty to disclose, disclosure "has been recognized as relevant to evaluating a case and as an aid in achieving settlements"]; *Szarmack v. Welch* (1972) 220 Pa.Super. 407 [289 A.2d 149,153] ["Such knowledge would tend to adjust the plaintiff's settlement objective"]; *Mosca v. Pensky* (1973) 73 Misc.2d 144 [341 N.Y.S.2d 219, 231] ["The primary rationale in support of discovery is that both counsel and the parties will realistically negotiate their claims, thereby maximizing efforts at settlement"].)

Accordingly, jurisdictions which have considered the disclosure problem in the context of bad faith (as distinct from discovery) have said that bad faith liability may indeed be predicated on a refusal to disclose policy limits. (See *Powell v. Prudential Property & Cas.* (Fla.Dist.Ct.App. 1991) 584 So.2d 12, 14 ["liability may be predicated on a refusal to disclose policy limits"]; *Szarmack v. Welch, supra,* 289 A.2d at p. 153 ["An insurance company would violate its obligation to an insured to act in good faith if it did not reveal the existence of low policy limits when such a revelation would serve to protect the insured from a judgment far above the policy limits"]; *Cernocky v. Indemnity Insurance Co. of No. Amer.* (1966) 69 Ill.App.2d 196 [216 N.E.2d 198, 205] [refusal to disclose policy limits was among factors indicating bad faith].)

The *Powell* case from the Florida Court of Appeal closely parallels the one before us, even to the point that the trial court there, as here, ruled as a matter of law (there, in a directed verdict, here in a summary judgment) that the absence of a formal settlement offer absolutely precluded bad faith. In *Powell,* as in the case before us, there was a request for policy limits by the attorney for a severely injured claimant prior to the instigation of litigation,

a refusal by the insurer to disclose them prior to litigation, a rejection of the limits after litigation commenced, and the ultimate rendering of an excess verdict against the policyholder. (See *Powell v. Prudential Property & Cas., supra*, 584 So.2d at p. 13.)

The *Powell* court rejected the idea that the "lack of a formal offer to settle" precluded a finding of bad faith, reasoning that the lack of a formal offer to settle was but "one factor to be considered." (*Powell v. Prudential Property & Cas., supra*, 584 So.2d at p. 14.) Citing another prominent authority in insurance law (14 Couch on Insurance (2d rev. ed. 1982) § 51:11, p. 398), the court noted that liability could indeed be predicated on a "refusal to disclose policy limits." (*Powell v. Prudential Property & Cas., supra*, 584 So.2d at p. 14.) Hence there was enough evidence to allow the jury to decide the case, and it was error to direct a verdict in favor of the insurer. (*Id.* at p. 15.)

## II

The *Powell* decision turned on the question of whether there are circumstances in which a liability insurer could be liable for bad faith refusal to settle when the claimant has not actually made a formal settlement offer. It was a negative answer to that question which prompted the trial court to grant the insurer's summary judgment motion, and which forms its primary line of defense in this appeal.

There is dicta in *Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 877 [110 Cal.Rptr. 511], which supports the insurer's position here. That is, in *Merritt* the appellate court opined that bad faith can occur "only" when a formal offer to settle an excess claim within policy limits is made.[2]

We do not follow the *Merritt* dicta. We now explain why that dicta is (a) truly dicta, and (b) not persuasive in the context of a refusal to contact the policyholder to obtain permission to disclose the policy limits which has the effect of foreclosing a settlement opportunity.

## A

*Merritt* arose out of a truck accident, in which a truck driver was badly injured when another truck made what appeared to have been an unsafe lane

---

[2]The dicta may be found at the top of page 877 in the official reporter. At the end of a long essay on bad faith in the liability insurance context, the court said: "While much remains obscure in this field of the law it is apparent from this summary that (1) the legal rules relating to bad faith come into effect only when a conflict of interest develops between the carrier and its insured; (2) a conflict of interest only develops when an offer to settle an excess claim is made within policy limits or when a settlement offer is made in excess of policy limits and the assured is willing and able to pay the excess." (*Merritt v. Reserve Ins. Co., supra*, 34 Cal.App.3d at p. 877.)

change right in front of him. (See *Merritt v. Reserve Ins. Co., supra,* 34 Cal.App.3d at p. 863.) The plaintiff never made a settlement offer. Indeed, in contrast to the case before us, the claimant never even "advance[d] any suggestion that settlement could be profitably discussed." (*Id.* at p. 877.) The closest the claimant came to a settlement offer was a demand for $400,000 in damages stated in the complaint (and increased on the day of trial to $650,000). (*Id.* at pp. 866, 877.) While the defendant trucking company's insurer's investigation had revealed a low probability of liability (see *id.* at pp. 864-865), the jury returned a large, excess verdict. The plaintiff gave a covenant not to execute and sued the insurer for bad faith. The appellate court reversed a judgment against the insurer.

The core of the *Merritt* opinion is a long essay preparatory to the application of the law to the facts (see *Merritt v. Reserve Ins. Co., supra,* 34 Cal.App.3d at pp. 867-877) exploring the nuances of an insurer's duties regarding settlement in a world where policyholders only contract for *limited* liability. The point of the essay is that the cause of action for bad faith is a necessary ameliorative to prevent the insurer from exposing the policyholder to unnecessary personal liability; it derives from the need to "strike a balance between conflicting interests." (See *id.* at p. 874.) Or, as the court said elsewhere in the opinion, bad faith law is an improvisation by the courts "to find a workable solution to the problem of conflict of interest." (*Id.* at p. 871.)

As complete as it was, the *Merritt* essay never tackled the problem of a settlement overture or suggestion made by the claimant—and whether *that* might engender a conflict of interest; the opinion did not have to. No possibility of settlement had ever been raised by claimant in any manner prior to trial, and the supposed bad faith of the insurer was predicated on three items of misfeasance by the insurer which, unlike the situation before us, had nothing to do with the insurer's *response* to any suggestions of settlement.[3] The essay was a gloss on the situation where the claimant *does* make an offer of settlement prior to judgment. (See *Merritt v. Reserve Ins.*

---

[3]The three items were:

(1) The insurer supposedly failed to make clear that the policyholder did not have any other insurance policies; had the insurer done so the claimant might have made a settlement offer. (*Merritt v. Reserve Ins. Co., supra,* 34 Cal.App.3d at p. 878.) To this the court answered that any confusion on the existence of other policies was the *insured's* fault, not the insurer's. (*Ibid.*)

(2) The insurer supposedly failed to "initiate settlement overtures" to the claimant. (*Merritt v. Reserve Ins. Co., supra,* 34 Cal.App.3d at p. 878.) Interestingly enough, the court did not reject this basis of liability on the legal ground that an insurer need never "initiate settlement overtures," but on the particular facts of the case before the court: There was no evidence *at all* to support the conjecture that "overtures" might have been fruitful. (*Ibid.*) Rather, the existence of a large workers' compensation lien made settlement "impossible." (*Ibid.*)

(3) The insurer dropped the ball in failing to notify the policyholder on the day of trial that the claimant had just increased the damages in the complaint from $400,000 to $650,000.

*Co., supra,* 34 Cal.App.3d at pp. 874-875, where the court makes constant reference to what happens when an insurer "receives" a settlement offer.) Thus there was no reason for the *Merritt* court to gratuitously stick in the word "only" when, at the end of its discussion, it said that a "conflict of interest" could "only" develop when an offer to settle is actually made. Indeed, not having exhaustively canvassed the possibilities bearing on insurer bad faith in the liability insurance context, *Merritt's* use of the word "only" must be deemed to be mere dicta.

## B

The use of the word "only" in *Merritt* was also improvident. A conflict of interest can indeed develop without a formal settlement offer being made by the claimant. The facts in the instant case demonstrate just such a conflict, albeit the diverse interests of the insurer and insured are not quite as obvious as in the more typical case when a formal offer to settle within policy limits is made.

First, there is the conflict between the insured's peace of mind and the elephantine lethargy endemic to many large organizations, certainly including many insurance companies. To wit, an insurance company must obtain the insured's written permission before policy limits may be disclosed. (Ins. Code, § 791.13; see generally *Griffith v. State Farm Mut. Auto. Ins. Co., supra,* 230 Cal.App.3d 59, 65-68.) If an insurer has a *blanket* rule against ever contacting its insureds regarding requests for disclosure, there is a marginal savings in time and paperwork on any given file. An insurer must rouse itself to complete the task of sending a letter to the insured explaining that a request for policy limits has been made and asking if the insured will, in writing, authorize disclosure. But to the degree that such a rule may have the real world effect of "foreclosing" the possibility of a quick settlement within policy limits, the insured has lost out.[4]

---

But that "lapse," said the *Merritt* court, had nothing to do with any loss of an opportunity to settle within policy limits. It only made settlement *less* likely. (See *Merritt v. Reserve Ins. Co., supra,* 34 Cal.App.3d at p. 879.)

[4]On appeal Amex argues that Boicourt has waived the point that Amex should have contacted the policyholder about the claimant's request for policy limits information, because there was no evidence in the summary judgment motion that Amex *didn't* seek authority from its insured. The argument fundamentally misconstrues the basic rules governing summary judgment motions. As *responding* party, Boicourt was entitled to have the conflicts and inferences resolved in his favor. An obvious inference from the adjuster's letter on behalf of Amex ("it is their policy not to disclose the amount of the policy limits") is that Amex *hadn't* sought authority, and it was therefore incumbent on Amex in its papers to show that there was

Second, there is the negotiating advantage an insurer gains for itself (but not for its insured) when it forces a claimant to make any settlement offer either (a) without benefit of knowledge of policy limits or (b) only after incurring the expense of filing litigation and sending out some initial discovery. It is the same sort of tactical one-upmanship that baseball managers try to obtain when they put in a right-handed pitcher to face a right-handed hitter, when chess players elect the white pieces, or when football captains elect to receive the ball after winning the toss. It doesn't always win the game, but it gives the player a slight edge in the competition. In negotiation, unlike chess, there is a slight advantage to the party who receives an offer over the party who first makes one, because the latter operates in a universe with less information: namely, what the other party thinks about the value of the transaction.

One might think that the expense of filing a complaint and sending out a simple interrogatory would mean that the choice to which the insurer puts the claimant is a negligible one. But that is not exactly so. Not every plaintiffs' lawyer is able to take every case to trial. The economics of plaintiffs' work places a premium on being able to settle cases as early in the process as possible. *That usually works to the advantage of policyholders as well.* They are spared the extra months of having a claim with a potential excess verdict hanging over their heads, with the concomitant stomach-churning uncertainty characteristic of all litigation.[5] *But it does not work to the advantage of insurers,* who usually benefit from the additional time value of any money eventually used to settle, as well as the additional economic pressure that the passage of time puts on the plaintiff's attorney who, if paid by contingency, must work for free until settlement or collectible judgment. Insurers also know that plaintiffs have the ability to bring only so many of their cases to trial, and know that, over the course of a large number of claims, putting plaintiffs' lawyers as a group to the choice of filing suit before they can find out the policy limits may "finesse" (in the sense of a bridge player skillfully forcing out a card from an opponent) a few settlements below policy limits.

In short, insurers *do* have a "selfish" interest (that is, one that is peculiar to themselves) in imposing a blanket rule which effectively precludes

---

no triable issue as to the fact that it had. Amex not having done so, this court must assume that Amex didn't contact its insured.

Amex's subsidiary argument, that it "had no duty to disclose the limits to Boicourt prior to commencement of the lawsuit," for which it relies on the *Griffith* case, is mere sophistry borne of the ambiguity in the word "duty." True, under *Griffith* and section 791.13 of the Insurance Code, Amex had no duty *to the claimant* to disclose the policy limits *to the claimant.* But the question in this case is whether Amex had a duty *to the policyholder* to seek authority *from the policyholder* to disclose the policy limits *to the claimant.*

[5]How many settlement judges over how many years have lectured litigants on the basic fact of life that there are few, if any, cases where an outcome is absolutely certain?

disclosure of policy limits, and that interest can adversely affect the possibility that an excess claim against a policyholder might be settled within policy limits. Thus, a palpable conflict of interest exists in at least one context where there is no formal settlement offer. We therefore conclude that a formal settlement offer is *not* an absolute prerequisite to a bad faith action in the wake of an excess verdict when the claimant makes a request for policy limits and the insurer refuses to contact the policyholder about the request.

## III

A few minor points must now be addressed, if only to clarify what this opinion is not saying. This case, after all, comes to us on a summary judgment based on a legal firebreak, which the trial court had erroneously thought to be impenetrable.

First, we are not saying as a matter of law that Amex is necessarily liable for bad faith here. Whether DiCesare's request for policy limits represented a genuine opportunity to settle an excess claim within policy limits to the benefit of the insured in this case or an attempt to try to set up Amex for this bad faith action, is not something that can be decided on this record. Nor do we opine whether the likelihood of an excess judgment under the facts here would have justified accepting a policy-limits-or-below offer. (See *Coe v. State Farm Mut. Auto. Ins. Co.* (1977) 66 Cal.App.3d 981, 989-990 [136 Cal.Rptr. 331] [insurer under no duty to accept unreasonable settlement offer].) There is some indication, for example, that the case might have been defensible (the accident being caused by a driver who swerved in front of Belcher's Volkswagen), but in any event that is an issue on which we can give no definitive opinion on this record. All we say now is that the claimant's request for the policy limits *might* have been a settlement opportunity which was arbitrarily foreclosed by the insurer for its own advantages to the insured's detriment.

Second, we are not importing the statutory requirement that liability insurers settle cases when the liability of their insured is reasonably clear (cf. Ins. Code, § 790.03, subd. (h)(5); see generally *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58]) into the substantive law of bad faith. While the dynamics of the two areas obviously overlap (e.g., a liability insurer who passed up the opportunity to settle a case where liability was clear for a reasonable sum within the policy limits would not only be committing classic bad faith, but would also be acting in contravention of the statute) our analysis is grounded strictly in the common law of bad faith in the liability insurance field.

Third, we do not explore the degree to which the implied covenant of good faith and fair dealing imposes on a liability insurer a duty to be "proactive" in settling cases, except to say that an insurer's blanket rule against contacting the policyholder to see if the policyholder wants the policy limits disclosed *can* be a basis for bad faith. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 12:289, p. 12B-18 (rev. #1 1998) ["Does the insurer's failure to *initiate* settlement negotiations or to make an offer to the third party claimant constitute 'bad faith'? The answer is not entirely clear . . . ."].) We do not even explore the extent of the lengths an insurer should go to in the course of *contacting* the policyholder.[6]

Fourth, the fact that Amex later *did* tender policy limits after litigation commenced *still might serve as the basis for a complete defense of this* bad faith suit. A *timely* settlement offer by a liability insurer does preclude a bad faith action. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:397, p. 12B-45 (rev. #1 1998).) However, on this record and briefing we cannot say the Amex's offer was necessarily timely.[7] And if the offer was indeed too late, it did not cure the act of bad faith in initially foreclosing settlement. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:399, p. 12B-45 (rev. #1 1998) ["The insurer's belated tender of its policy limits does *not* absolve it of liability for an earlier bad faith refusal to settle."].) Being that the case comes to us from a successful summary judgment motion, we must assume that the offer was untimely. All we know on this record is that the claimant would have accepted a policy limits offer prior to filing a complaint and that no negotiations were even started which might have elicited such an offer because the insurer had a company rule against disclosure of policy limits irrespective of whether the insured might, if given the opportunity, have authorized their disclosure.

---

[6]Though, if we may be permitted some dicta on the point, a simple letter to the insured's last known address, saying that a claimant has requested disclosure of the policy limits and enclosing a form in conformity with Insurance Code section 791.13, subdivision (a), should suffice. While an insurer should not put its administrative convenience ahead of the insured's interest in settling within policy limits, we see no reason to require an insurer to do more than is reasonably necessary to give the insured the opportunity to make the disclosure decision.

[7]For example, suppose that the only reason Boicourt's attorney did not accept a policy limits offer tendered by the insurer five months after the filing of the complaint was part of a deliberate strategy to "set up" the insurer for this bad faith suit based on a postured rejection of a postfiling settlement limits offer that was really nothing more than the expression of pique that the insurer had stonewalled the prefiling request for policy limits? Would the offer made at that point be timely or untimely? Since the papers supporting Amex's summary judgment motion did not explore the factual background of the question, and the parties have not briefed it, we need not explore it further here.

## DISPOSITION

The judgment is reversed. Because a reversal of summary judgment is essentially an interlocutory proceeding (at this juncture we do not know whether Amex or Boicourt will ultimately prevail), we decline to award the costs in this appeal now, but give the trial court discretion to award this appeal's costs to the ultimate winner.

Rylaarsdam, J., and Bedsworth, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 14, 2000.