Filed 11/6/13 (unmodified version attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| PAUL REID, | B241154 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 458121) |
| v. | |
| MERCURY INSURANCE COMPANY, | **ORDER MODIFYING OPINION and DENYING PETITION FOR REHEARING** [no change in judgment] |
| Defendant and Respondent. | |

THE COURT:

IT IS ORDERED that the opinion filed in the above-captioned matter on October 7, 2013, be modified as follows:

In the first full paragraph on page 5, delete the third sentence beginning with "(In mid-September 2007"), and replace it with the following sentence:

> (In mid-September 2007, plaintiff's insurer advised defendant's adjuster,
> Mr. Schram, that plaintiff's underinsured motorist coverage exceeded
> defendant's policy limits.)

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

BIGELOW, P. J.                FLIER, J.                GRIMES, J.

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| PAUL REID, | B241154 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 458121) |
| v. | |
| MERCURY INSURANCE COMPANY, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court for the County of Los Angeles. Ronald M. Sohigian, Judge.  Affirmed.

The Yarnall Firm, Delores A. Yarnall; Ammirato & Palumbo, Bruce Palumbo; Dewitt Algorri & Algorri and Mark S. Algorri for Plaintiff and Appellant.

Hager Dowling Lim & Slack, Alison M. Bernal and John V. Hager for Defendant and Respondent.

.

_____

**SUMMARY**

This case involves an insurer's duty to its insured to settle a third party claim within policy limits, when liability is clear and there is a substantial likelihood of a recovery in excess of policy limits. The question is whether the insurer, in the absence of any demand or settlement offer from the third party claimant, must initiate settlement negotiations or offer its policy limits, and if so how quickly it must do so, to avoid a claim of bad faith failure to settle.

In this case, the insured's liability was clear almost immediately after the collision. The insurer's claims manager had decided, within a little over six weeks, that while the insurer needed medical records, the insurer must tender the policy limits to the third party claimant "as soon as we have enough [information] available to do so." No settlement demand was made by the claimant, who filed suit against the insured three and one-half months after the collision. The medical records were not forthcoming from the claimant until seven months after the collision, and another three months passed before the insurer offered its policy limits. Under these circumstances, the trial court found the insurer not liable to its insured for bad faith failure to settle and granted the insurer's motion for summary judgment.

We affirm. An insurer's duty to settle is not precipitated solely by the likelihood of an excess judgment against the insured. In the absence of a settlement demand or any other manifestation the injured party is interested in settlement, when the insurer has done nothing to foreclose the possibility of settlement, we find there is no liability for bad faith failure to settle.

**FACTS**

## 1. The Chronology of Events

Defendant Mercury Insurance Company insured Zhi Yu Huang under an automobile policy with bodily injury policy limits of $100,000 per person and $300,000 per accident. On June 24, 2007, Ms. Huang was involved in a multivehicle collision. The police report showed Ms. Huang failed to stop at a red light and collided with a car driven by plaintiff Shirley Reid. That collision caused plaintiff's car to collide with a

third car driven by Chinelo Ogbogu.  Plaintiff sustained major injuries and could not provide police with a statement.  Plaintiff's passenger, Edith Looschen, was also injured, as were Ms. Ogbogu and her passenger, Mercy Ngoka.  All four made claims to defendant for their injuries.

On July 18, 2007, defendant called plaintiff's insurer and Ms. Ogbogu's insurer to tell them defendant "was accepting liability and that there may be a 'limits issue.'"  The next day, defendant's adjuster, Patricia Feng, recommended defendant accept 100 percent liability.  That same day, Paul Reid, plaintiff's son, who had authority to act for his mother, told Ms. Feng his mother was still in intensive care and asked if defendant could disclose policy limits.  Defendant could not, without written permission from Ms. Huang.  A few days later, Ms. Feng wrote to plaintiff saying defendant's investigation was incomplete and "therefore we are not in a position to resolve liability or settlement of this claim," and to do so required a recorded interview with plaintiff and other information.  Another letter from Ms. Feng asked plaintiff to complete authorizations for defendant's review of the pertinent medical records, so that defendant could "properly verify and evaluate your injury . . . ."  Defendant sent similar letters to Ms. Looschen and to a lawyer representing Ms. Ogbogu and Ms. Ngoka.

On July 26, 2007, another adjuster for defendant, Adam Schram, told Ms. Huang the preliminary investigation indicated the claims for damages "may exceed your policy limits" and "you have the right to consult legal counsel, at your own expense, to advise you concerning your uninsured interest" but that defendant would "continue our attempts to conclude this matter within your policy limits and will keep you informed as to the status of settlement offers, demands, and negotiations."  Mr. Schram also talked to Mr. Reid that day, who told him his mother was still in intensive care.  Mr. Schram told Mr. Reid he still could not disclose the policy limits.

The day after he spoke with Mr. Schram, Mr. Reid hired a lawyer, Joseph West, because he "felt [he] was being jerked around by [defendant]" because they would not disclose the policy limits and said "they couldn't determine liability at that time, and that was a month after the accident."  He later testified he told Mr. West his mother had

3

$250,000 in underinsured motorist coverage. He had notified his mother's insurer, State Farm, of the collision and was told about the underinsured motorist coverage but that plaintiff first had to resolve the claim against Ms. Huang before she could recover on her underinsured motorist coverage. Mr. Reid testified he "authorize[d] Mr. West to settle the case on behalf of [his] mother," he did not authorize any specific amount, and he (Mr. Reid) "wanted to settle it as quickly as possible."

On July 28, 2007, Mr. West wrote to defendant confirming his representation of plaintiff "with respect to the devastating automobile accident . . . caused by your insured." Mr. West's letter stated plaintiff had been "horribly injured" and remained in the hospital in intensive care. Mr. West asked for disclosure of the whereabouts of Ms. Huang's vehicle, all applicable policy limits, and whether Ms. Huang was protected by an umbrella policy. The letter stated the request was made pursuant to section 790.03, subdivision (h)(1) and (2) of the Insurance Code.[1]

On August 2, 2007, defendant's claims manager noted the "[o]nly excess [bodily injury] exposure at this time appears to be [plaintiff]"; "[w]e will need complete medical records/billings for all [claimants]"; and "[w]e will need to tender [policy limits] to [plaintiff] as soon as we have enough [information] available to do so." The claims manager recommended bodily injury reserves be set at $100,000 for plaintiff, $50,000 for Ms. Looschen, $12,000 for Ms. Ogbogu, and $7,500 for Ms. Ngoka.[2]

On August 15, 2007, Mr. Schram responded to Mr. West's letter, stating first, "[i]n order to complete a thorough investigation, I must obtain a detailed statement from

---

[1] Insurance Code section 790.03 defines certain unfair claims settlement practices, including "[m]isrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue" and "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." (§ 790.03, subd. (h)(1) & (2).)

[2] The reserves for Ms. Looschen, Ms. Ogbogu and Ms. Ngoka were ultimately raised to $100,000, $15,000 and $10,000 respectively, and they eventually settled for $100,000, $22,500 and $10,000 respectively.

4

your client and inspect the vehicle." Mr. Schram again requested plaintiff's signature on medical authorizations "[i]n order to properly verify and evaluate your client's injury . . . ." The letter disclosed the policy limits, confirmed Ms. Huang was not "in the course of employment" and carried no excess insurance coverage, and asked for proof of plaintiff's liability insurance.

According to Mr. Reid, Mr. West told him in August 2007 the policy limits were $100,000, and defendant was not prepared to settle or offer the policy limits. Mr. Reid testified that in August 2007, he would "definitely" have accepted the policy limits to settle his mother's case, and by "definitely," he meant that "[i]n order to get to the [$250,000] total [using State Farm's underinsured motorist coverage], I had to get the [$100,000] from [defendant]." (In mid-September 2007, plaintiff's insurer advised defendant's adjuster, Mr. Schram, about the underinsured motorist coverage.) Mr. Reid also testified he would have accepted the policy limits in July, after he ran an asset check on Ms. Huang, as that would have permitted him to look to the underinsured motorist coverage, and also that was before he hired Mr. West and he "wouldn't have had to give [West] a portion of it."

When Mr. West was asked why he did not write a demand letter to defendant, Mr. West said defendant had been adjusting the case for a month and, despite knowing Ms. Huang ran the red light and plaintiff was still hospitalized, responded to his letter by requesting a statement from plaintiff and "saying that they don't have enough information to resolve," which Mr. West found disheartening. So, Mr. West said, "there was no point in . . . this type of [demand] letter . . . ." "Not only did they request a statement, but they're saying that they don't have enough information to resolve. They know -- they knew enough to be able to resolve this case early on or at least to make an offer to resolve it."

On October 10, 2007, plaintiff sued Ms. Huang.

On October 29, 2007, defendant wrote to Mr. West saying that, to resolve plaintiff's claim, defendant was "still pending" a recorded interview and various medical records.

5

On November 8, 2007, defendant's claims documents show, under the heading "Final Approval," adjuster authority to offer $100,000 and "claim recommendation approved" by a claims manager.

On December 6, 2007, defendant again wrote to Mr. West, again saying, to resolve plaintiff's claim, defendant was "still pending" a recorded interview and various medical records.

On January 29, 2008, Mr. West sent plaintiff's medical records to defendant.

On May 2, 2008, defendant wrote to Mr. West, stating it "has agreed to tender its $100,000.00 policy limit to your client in order to resolve this matter in its entirety." Plaintiff rejected the offer.

More than two years later, after a bench trial in plaintiff's suit against Ms. Huang, judgment was entered against Ms. Huang for more than $5.9 million. During that lawsuit, on March 11, 2009, Ms. Huang declared bankruptcy, and the bankruptcy trustee later assigned to plaintiff any potential rights Ms. Huang had against defendant.

Plaintiff then filed this suit against defendant for breach of the covenant of good faith and fair dealing and for breach of contract, essentially on a theory of bad faith failure to settle. The complaint alleged defendant not only failed to make a reasonable offer within a reasonable time, but rejected and discouraged any efforts at settlement. Further, plaintiff alleged defendant refused to make a prompt and thorough investigation, failed to communicate and respond to communications in a timely manner, and insisted on receiving information and materials that were already provided and known, or were immaterial and were therefore unnecessary to defendant's evaluation. The complaint alleged that as a consequence of defendant's breaches, "Huang was exposed to and suffered an excess judgment," and sought recovery of more than $6.9 million.

2.     **The Motion for Summary Judgment**

The sole basis for defendant's motion for summary judgment was plaintiff could not prove breach of contract or bad faith "because plaintiff never made a demand for settlement within the policy limits."

6

Defendant's evidence consisted of undisputed facts relating the chronology of events described above. Defendant also relied on Mr. West's deposition testimony. Mr. West was asked if he made a policy limit demand on defendant. He replied by saying in his July 28 letter, "some of the pertinent and significant facts were set forth and [defendant's] response was that . . . they needed to take a statement from my client and my client was in the hospital with a tube in her throat. It wasn't at that point in time clear that she was going to live. This was $100,000 and [defendant] elected, rather than to offer the policy, to request a statement from her. I viewed that as a refusal [to offer up the policy]." Mr. West was then asked, "Had you said either orally or in writing that your client would settle for the policy limit if they offered it?" and answered, "I don't believe I ever said that, no."

Defendant also asserted facts that plaintiff disputes, but these were essentially argumentative assertions and responses, and the disputes are immaterial.

Plaintiff's opposition to defendant's summary judgment motion included her own statement of undisputed facts, many of which defendant disputed in its reply. Defendant also objected to much of plaintiff's evidence as irrelevant. The court did not rule on these objections. In addition to evidence already described, plaintiff offered the following evidence.

First, defendant's adjusters understood, when a third party claimant makes a request for policy limits information, "it is an attempt to determine what is available for settlement."

Second, defendant's adjuster, Mr. Schram, knew defendant's training manual directs its employees to "[c]ontinuously keep [our insured] informed of all exposures and settlement negotiations. [Our insured] may want us to settle a higher exposure separately, particularly in serious injury cases. Bad Faith has been found when the insured contended that he would have wanted the carrier to pay the per person limit to settle the worst case. When the company is faced with multiple claims whose value exceeds the policy limit, communication with the insured is essential. Especially where one claim is significantly worse than the others, the insured should be consulted about the

possibility of settling the severe injury claim separately."  Mr. Schram did not discuss this possibility with Ms. Huang, but sent Ms. Huang the July 26, 2007 letter notifying her damages might exceed policy limits and of her right to counsel at her own expense.

Third, defendant's adjuster, Nancy Murad, testified she "couldn't accept a demand from [plaintiff] until all the other claims were analyzed and evaluated as being within Huang's policy limits"; and even after plaintiff provided medical records on January 28, 2008, she "didn't have all of the records yet," meaning the records "on all the claimants," so she did not believe she was "in a position to make an offer to [plaintiff] of policy limits."

Fourth, plaintiff asserted "[a]t no time did [defendant] inform [plaintiff] or West that the reason they were not prepared to settle was because there were three other claimants."

### 3.     The Trial Court's Ruling

The trial court granted defendant's motion for summary judgment.  The court reasoned the evidence did not show plaintiff ever made a settlement demand or otherwise told defendant that Mrs. Reid would accept the policy limits in full settlement.  The court found the evidence did not show Mr. Reid's initial conversation with Ms. Feng, or Mr. West's initial letter of July 28, 2007, constituted "opportunities to settle" within the meaning of that phrase as it has been discussed in the cases.  The court had found no California authority "standing for the proposition that there is a duty to settle when there is a claim that is vastly in excess of the policy limits regardless of whether a settlement demand has been made."  The court observed Mr. West's deposition "does not show that the [July 28] letter was an initiation of a settlement" and "doesn't have any comments about other attempts to settle . . . .  Mr. West actually comes out and says flatly that he didn't say either orally or in writing that Ms. Reid would settle for the policy limits if – if

8

those are made available to her." Judgment was entered and plaintiff filed a timely appeal.[3]

## DISCUSSION

### 1.      Standard of Review

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Where summary judgment has been granted, we review the trial court's ruling de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) We consider all the evidence presented by the parties in connection with the motion (except that which was properly excluded) and all the uncontradicted inferences that the evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We affirm summary judgment where the moving party demonstrates that no triable issue of material fact exists and that it is entitled to judgment as a matter of law. (§ 437c, subd. (c).)

### 2.      Bad Faith Liability Cannot Be Founded Solely Upon an Insurer's Failure to Initiate Settlement Discussions or Offer its Policy Limit

For bad faith liability to attach to an insurer's failure to pursue settlement discussions, in a case where the insured is exposed to a judgment beyond policy limits, there must be, at a minimum, some evidence either that the injured party has communicated to the insurer an interest in settlement, or some other circumstance demonstrating the insurer knew that settlement within policy limits could feasibly be negotiated. In the absence of such evidence, or evidence the insurer by its conduct has actively foreclosed the possibility of settlement, there is no "opportunity to settle" that an insurer may be taxed with ignoring.

In this case, there was no settlement offer from plaintiff, and no evidence from which any reasonable juror could infer that defendant knew or should have known

---

**3**      Shortly after judgment was entered, plaintiff died, and the trial court ordered Paul Reid substituted as the plaintiff instead of Shirley Reid.

9

plaintiff was interested in settlement. Nor does plaintiff accurately characterize defendant's conduct when he asserts that defendant "affirmatively refused to settle" or otherwise rejected "opportunities to settle" or discouraged settlement overtures. Accordingly, defendant cannot be liable for bad faith failure to settle.

The general contours of an insurer's liability for breach of its duty to settle in an appropriate case have been established for a long time.

"When there is a great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing." (*Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 (*Comunale*); accord, *Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 14-15, 19 (*Johansen*) ["The implied covenant of good faith and fair dealing imposes a duty on the insurer to settle a claim against its insured within policy limits whenever there is a substantial likelihood of a recovery in excess of those limits"]; *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 430 (*Crisci*) ["liability based on an implied covenant exists whenever the insurer refuses to settle in an appropriate case and . . . liability may exist when the insurer unwarrantedly refuses an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement"].)

As *Crisci* tells us, liability is imposed "not for a bad faith breach of the contract *but for failure to meet the duty to accept reasonable settlements*, a duty included within the implied covenant of good faith and fair dealing." (*Crisci, supra,* 66 Cal.2d at p. 430, italics added.) *Comunale*, *Johansen* and *Crisci* all involved an offer of settlement at or below policy limits. In such a case, "the only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer." (*Johansen, supra,* 15 Cal.3d at p. 16.) The Courts of Appeal have explained "the problem is one of conflict of interest," and "whenever a

10

conflict of interest breaks out the carrier becomes obligated to protect the interests of the assured equally with its own." (*Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 875, 868 (*Merritt*).)

According to *Merritt*, "normally the interests of carrier and assured are parallel, and . . . only with the tender of a settlement offer within policy limits do the interests of the assured and the carrier diverge." (*Merritt, supra*, 34 Cal.App.3d at p. 875.) *Merritt* tells us: "[I]t is apparent . . . (1) the legal rules relating to bad faith come into effect only when a conflict of interest develops between the carrier and its insured; (2) a conflict of interest only develops when an offer to settle an excess claim is made within policy limits or when a settlement offer is made in excess of policy limits and the assured is willing and able to pay the excess." (*Id.* at p. 877; see *id.* at pp. 877, 879 [where the plaintiff made no offer to settle and never "advance[d] any suggestion that settlement could be profitably discussed," the case "does not involve a conflict of interest and does not present a situation in which the carrier can be found to have acted in bad faith toward its assured"].)

Other Courts of Appeal have disagreed with *Merritt*'s statement that a conflict of interest develops "only" when a formal settlement offer has been made. In a number of circumstances, courts have found a conflict of interest can arise, and an insurer may be liable for bad faith refusal to settle, without a formal settlement offer. But none of these cases suggests that an insurer has a duty to initiate settlement discussions – or an "opportunity to settle" – in the absence of any indication from the injured party that he or she is inclined to settle within policy limits (or at some higher figure where the insured is willing to pay the excess over policy limits).

In *Boicourt v. Amex Assurance Co.* (2000) 78 Cal.App.4th 1390 (*Boicourt*), the insurer had a blanket rule against disclosing its policy limits to a claimant before litigation. The court concluded such a rule "creates a conflict of interest between liability insurers and their insureds," giving the insurer "a tactical advantage vis-à-vis the claimant by forcing the claimant to make any prelitigation offers 'in the dark.'" (*Id.* at p. 1392.) *Boicourt* thus reversed a grant of summary judgment to the insurer that was based on "the

11

idea that there could be no conflict of interest absent a formal settlement offer." (*Ibid.*) Noting the relevance of disclosure of policy limits to the settlement of a claim, and the potential "real world effect of 'foreclosing' the possibility of a quick settlement within policy limits" (*id.* at pp. 1393, 1397), *Boicourt* concluded: "In short, insurers *do* have a 'selfish' interest (that is, one that is peculiar to themselves) in imposing a blanket rule which effectively precludes disclosure of policy limits, and that interest can adversely affect the possibility that an excess claim against a policyholder might be settled within policy limits. Thus, a palpable conflict of interest exists in at least one context where there is no formal settlement offer. We therefore conclude that a formal settlement offer is *not* an absolute prerequisite to a bad faith action in the wake of an excess verdict when the claimant makes a request for policy limits and the insurer refuses to contact the policyholder about the request." (*Id.* at pp. 1398-1399; see *id.* at p. 1399 ["the claimant's request for the policy limits *might* have been a settlement opportunity which was arbitrarily foreclosed by the insurer for its own advantages to the insured's detriment"].)[4]

Several other cases also describe circumstances where no formal demand for settlement within policy limits is necessary for bad faith liability to attach. With the possible exception of one Ninth Circuit case, also described below, all the cases involve circumstances where the claimant has conveyed to the insurer an interest in settlement, and the insurer has rejected or ignored the opportunity to negotiate a settlement.

First, where multiple insurers are involved, the absence of a formal demand within the policy limits of *one* of the multiple insurers does not preclude a bad faith claim

---

[4] Plaintiff cites *Ivy v. Pacific Automobile Ins. Co.* (1958) 156 Cal.App.2d 652, 659 (*Ivy*), as holding "a conflict of interest arises, not only when plaintiffs demand settlement, but, rather, *whenever* 'excess liability may be involved.'" *Ivy* does not stand for that proposition. It does say when liability in excess of policy limits is involved, the insurer's duty to act in good faith "becomes important," and further: "All of the cases agree that in order to act in good faith the company, as a minimum, must make a diligent effort to ascertain the facts upon which a good faith judgment may be predicated, where possible excess liability is involved, must communicate the result of such investigation to the insured, *and must inform him of any settlement offers that may affect him*, so that the insured may take proper steps to protect his own interests." (*Id.* at p. 660, italics added.)

12

against that insurer. (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498 (*Howard*).) But in *Howard*, there *was* a settlement demand "well within the primary insurance policy limits of the multiple insurers on the risk . . . ." (*Id.* at p. 525.) That fact was relevant "in evaluating whether an insurer, in a multiple-insurer case, had an opportunity to settle." (*Ibid.*) If defendant and the other insurers had responded to the offer with policy limits, they "could have settled the litigation"; the law "'cannot excuse one insurer for refusing to tender its policy limits simply because other insurers likewise acted in bad faith.'" (*Ibid.*)

Second, several federal court cases have said there is no need, under certain circumstances, for a formal settlement demand from the claimant in order for bad faith liability to attach. But those cases too involved evidence the insurer knew of the claimant's interest in settlement and ignored it. For example, in *Gibbs v. State Farm Mut. Ins. Co.* (9th Cir. 1976) 544 F.2d 423, the insurer was apprised that plaintiff had stated on numerous occasions that "he wanted coverage only to the limits of the insurance policy." (*Id.* at p. 427.) The plaintiff's statements, the court held, "gave [the insurer] a reasonable opportunity to settle the claim within the policy limits." (*Ibid.*) In *Continental Cas. Co. v. United States Fid.& Guar. Co.* (N.D.Cal. 1981) 516 F.Supp. 384, the injured party made a demand above policy limits, but the insurer "made no effort to ascertain whether [its insured] was willing to contribute" the amount above policy limits, and instead decided "it would not even consider the demand and would proceed to trial." (*Id.* at p. 388.) This conduct "frustrated the purpose of the duty of good faith and fair dealing." (*Ibid.*)

Third, plaintiff relies on a New Jersey case, *Rova Farms Resort, Inc. v. Investors Ins. Co. of Amer.* (N.J. 1974) 323 A.2d 495. But *Rova Farms* involved the insurer's intransigence in the face of a clearly attainable settlement. Rejecting the insurer's contention that, "as a matter of law, it had no obligation to offer its policy limit in settlement without a firm, authorized and explicit demand within that figure," the *Rova Farms* court said: "The better view is that the insurer has an affirmative duty to explore settlement possibilities. [Citation.] At most, the absence of a formal request to settle

13

within the policy is merely one factor to be considered in light of the surrounding circumstances, on the issue of good faith." (*Id.* at pp. 504, 505.) While no formal demand had been presented (*id.* at p. 504), there were "a multitude of circumstances which should have impelled [the insurer] to energize a clearly attainable settlement" of the claim (*id.* at p. 501), yet the insurer "[a]t no time" increased an offer it made to settle at a fraction of its policy limit. (*Id.* at p. 499.) As the *Rova Farms* court said, "the opportunities for settlement were so viable that it took a special genius at intransigence to kill them." (*Id.* at p. 506.)

Fourth, plaintiff argues Insurance Code section 790.03, subdivision (h)(5) (section 790.03) "expressly imposes" on insurers an "affirmative duty to settle" when liability is reasonably clear. Plaintiff reads the statute far too broadly.

Section 790.03 defines certain practices as "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." These include "[k]nowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices," including "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." (§ 790.03, subd. (h)(5).)

There is no private civil cause of action "against an insurer that commits one of the various acts listed in section 790.03, subdivision (h)" (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 304), although violations of the section "'may evidence the insurer's breach of duty to its insured'" under the implied covenant of good faith and fair dealing. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 916, quoting Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 14:45.21, p. 14-15; see *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1078 ["evidence of an insurer's violations of the statute and the corresponding regulations" was properly admitted to support the plaintiff's contention the insurer had breached the implied covenant by its actions].)

But section 790.03 does not purport to define the circumstances that give rise to a breach of the insurer's obligation to "attempt[] in good faith to effectuate prompt, fair,

14

and equitable settlements" and nothing in the statute requires or suggests the conclusion that an insurer's failure to *initiate* settlement negotiations, in the absence of any expression of interest in settlement from the claimant, may give rise to a bad faith claim.

Finally, in *Du v. Allstate Ins. Co.* (9th Cir. 2012) 697 F.3d 753 (*Du*), the plaintiff made the same claim plaintiff makes in this case: that the insurer acted in bad faith when it "did not attempt to reach a settlement of [the plaintiff's] claims after [the insured's] liability in excess of the policy limit became reasonably clear." (*Id.* at p. 755.) The appeal in *Du* raised the question "whether the duty to settle described in CACI 2337 can be breached absent a settlement demand from the third party claimant . . . ."[5] (*Id.* at p. 757.) But *Du* did not resolve the plaintiff's claim, since the *Du* court agreed with the trial court that there was no evidentiary basis for the instruction. (*Id.* at pp. 755, 758.)[6]

---

**5**    CACI No. 2337 describes factors a jury may consider in evaluating an insurer's conduct in a bad faith action. It states: "In determining whether [*name of defendant*] acted unreasonably or without proper cause, you may consider whether the defendant did any of the following: [¶] . . . [¶] [(e) Did not attempt in good faith to reach a prompt, fair, and equitable settlement of [*name of plaintiff* ]'s claim after liability had become reasonably clear.]" The instruction lists 15 other factors (none of which is relevant in this case), and states "[t]he presence or absence of any of these factors alone is not enough to determine whether [*name of defendant*]'s conduct was or was not unreasonable or without proper cause. You must consider [*name of defendant*]'s conduct as a whole in making this determination." The "directions for use" for CACI No. 2337 state that, while there is no private cause of action under section 790.03, "this instruction may be given in an insurance bad-faith action to assist the jury in determining whether the insurer's conduct was unreasonable or without proper cause.**"**

**6**    *Du* does have some similarities to this case. Here, as in *Du*, the insurer made a policy limits offer – in *Du*, about a year after the accident and here, 10 months after the accident – that was rejected. And here, as in *Du*, the substance of plaintiff's bad faith claim is that "the case would have been settled within policy limits had [the insurer] initiated earlier settlement negotiations." (*Du, supra,* 697 F.3d at p. 758.) In *Du*, where the court was reviewing a jury verdict for the insurer, the court found there was no evidence that the insurer "should or could have made an earlier settlement offer to [the plaintiff]." (*Id.* at p. 759.) This was because the insurer "lacked corroborating proof of the extent of [the plaintiff's] injuries and medical expenses"; until the insurer offered its policy limits, "the only information [the insurer] had regarding [the plaintiff's] injuries and medical bills were the uncorroborated and conflicting assertions by [the plaintiff] and

15

In short, nothing in California law supports the proposition that bad faith liability for failure to settle may attach if an insurer fails to initiate settlement discussions, or offer its policy limits, as soon as an insured's liability in excess of policy limits has become clear. Nor will this court make such a rule of law, for which neither precedent nor sound policy considerations have been offered.

We find no merit in plaintiff's argument that defendant's conduct brings it within the case precedents that permit bad faith liability without a formal settlement offer from the claimant. Plaintiff's claims that defendant "affirmatively refused to settle, rejected opportunities to settle, and discouraged [plaintiff's] settlement overtures" are entirely without support in the evidence. While plaintiff's brief consistently refers to Mr. Reid's "settlement inquiries," and to his and Mr. West's attempts "to open a settlement dialogue," and to defendant's "repeatedly" telling them it "could not even accept liability," none of those characterizations comports with the evidence.

Mr. Reid asked for disclosure of the policy limits, and defendant disclosed those limits four weeks later, after it obtained the necessary permission from the insured to do so. We will not construe a bare request to know the policy limit as an opportunity to settle. Nor could any reasonable juror construe Mr. West's July 28, 2007 letter as "an initiation of settlement" or a settlement opportunity. And Mr. Reid's willingness to settle for policy limits in July or August, as he testified, was not communicated to defendant. (Even that testimony was contradicted by his own testimony that, while he wanted to settle, he did not authorize his lawyer to do so for policy limits. Plaintiff did not even know the policy limits until defendant disclosed them (through no fault of the insurer).)

_____

her counsel." (*Ibid.*) In *Du*, the plaintiff's expert conceded that the insurer "could not base a settlement offer solely on the representations of claimant and claimant's lawyer," and that the insurer (who made repeated efforts to obtain the information) "could not have obtained [the plaintiff's] medical records without getting them from [the plaintiff's] lawyers." (*Ibid.*) And, in *Du* the insurer had no proof of the injuries of the other three individuals injured in the accident prior to its offer of policy limits, and paying the plaintiff the limits "could have left [the insured] underprotected" if the other three claims exceeded the remaining limits. (*Ibid.*)

16

Nor could any reasonable juror find defendant "discouraged" settlement by "repeatedly" telling plaintiff it could not accept liability. The only two relevant items of evidence, a July 23 letter and a July 26 phone conversation, cannot be construed as a repeated "refus[al] to even admit liability."**7** Indeed, it is undisputed defendant told plaintiff's insurer on July 18 it was *accepting* liability, and no other communications to plaintiff suggest otherwise.

Finally, plaintiff argues the insurer's persistent letters asking for medical records and a recorded interview – in plaintiff's words, "demand[ing] recorded statements from persons in intensive care" – operated to discourage plaintiff from making a settlement demand. No reasonable juror reviewing the evidence could reach that conclusion either. The letters are status reports of pending items, to which there is no evidence of any response by plaintiff, and cannot be the foundation for a bad faith claim.

In summary, when a claimant offers to settle an excess claim within policy limits, an opportunity to settle exists and a conflict of interest arises, because a divergence exists between the insurer's interest in paying less than the policy limits and the insured's interest in avoiding liability beyond the policy limit. (*Merritt, supra,* 34 Cal.App.3d at p. 873.) And a conflict may also arise, without a formal settlement offer, when a claimant clearly conveys to the insurer an interest in discussing settlement but the insurer ignores the opportunity to explore settlement possibilities to the insured's detriment, or when an insurer has an arbitrary rule or engages in other conduct that prevents settlement

---

**7** A letter of July 23, 2007, from defendant's adjuster, Ms. Feng, to plaintiff says: "This is to advise you that our investigation into the above referenced incident is still incomplete at this time and therefore we are not in a position to resolve liability or settlement of this claim. In order to do so, we need the following," then listing a recorded interview, "medical specials," and two other items from plaintiff's insurance company. Then, a few days later on July 26, Mr. Reid spoke to adjuster Mr. Schram. Mr. Reid testified the "gist" of the conversation was about property damage to the car, "and they weren't at a point where they could determine liability at that time." Assuming the letter or Mr. Schram's conversation with Mr. Reid amount to a "refus[al] to even admit liability," they are the only such statements, and they occurred only one month after the accident.

17

opportunities from arising.  (*Boicourt, supra,* 78 Cal.App.4th at p. 1399.)  But nothing like that happened here.

An "opportunity to settle" does not arise simply because there is a significant risk of an excess judgment.  And none of the evidence presented to the trial court, disputed or not, allows an inference that plaintiff at any time conveyed to defendant any interest in settlement, at policy limits or otherwise, at any time before defendant offered its policy limits.  In short, there was no evidence of a bad faith failure to settle in this case.  Accordingly, there was no foundation for a claim of breach of contract or breach of the insurer's covenant of good faith and fair dealing.

## DISPOSITION

The judgment is affirmed.  Defendant shall recover its costs on appeal.


GRIMES, J.


We concur:


BIGELOW, P. J.



FLIER, J.


18