Filed 10/17/14; mod. & pub. orders 11/12/14 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SONIA GRACIANO, | D061956 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00055207-CU-IC-NC) |
| MERCURY GENERAL CORPORATION et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Judge. Reversed.

Hager Dowling Lim & Slack, John V. Hager and Alison M. Bernal for Defendants and Appellants.

Dabney Finch and Carla DeDominicis for Plaintiff and Respondent.

Plaintiff Sonia Graciano suffered severe injuries when she was struck by a car driven by Saul Ayala (Saul). Saul was insured by a policy issued by defendant California Automobile Insurance Company (CAIC), which had policy limits of $50,000. Less than three weeks after Graciano's attorney first contacted CAIC alleging Graciano was injured

by one of CAIC's insureds, during which time Graciano misidentified both the name of the driver and the applicable insurance policy, CAIC completed its investigation of the accident, identified the correct insurance policy and driver, and tried to settle Graciano's claim against Saul by delivering to Graciano's attorney a "full policy limits offer."

Graciano did not accept CAIC's full policy limits offer and, in the present action, asserts CAIC and its parent and affiliated companies (together Defendants) acted in bad faith, based on an alleged "wrongful failure to settle." Graciano argues CAIC could have and should have earlier discovered the facts, and should have made the full policy limits offer more quickly. The jury found in favor of Graciano and this appeal followed.

CAIC asserts that, as a matter of law, there was no evidence to support the verdict that CAIC acted in bad faith by unreasonably failing to settle Graciano's claim against Saul. We agree, and reverse the judgment.[1]

I

FACTUAL BACKGROUND

A. The Accident

In the early morning hours of October 20, 2007, Graciano was severely injured when she was struck by a 2004 Cadillac driven by Saul, who had been drinking before the accident.

---

[1]    CAIC alternatively asserts on appeal that, even assuming the evidence could have supported the verdict, the trial court prejudicially erred by excluding evidence elaborating on CAIC's attempt to convey its offer to settle Graciano's claim against Saul. CAIC also argues the court erred by summarily adjudicating that entities other than CAIC were jointly and severally liable for the judgment under alter ego principles. Because of our conclusion that no substantial evidence supports the finding CAIC wrongfully did not settle Graciano's claim against Saul, we do not address CAIC's alternative claims.

B. The Two CAIC Policies

Saul was a named insured on CAIC policy No. 040115180005897, in effect on the date of the accident (Saul's policy) with a policy limit of $50,000. The Cadillac was a listed vehicle on Saul's policy.

CAIC had also insured Jose Saul Ayala (Jose) under a separate policy (policy No. AP00401514, Jose's policy), and the Cadillac was also a listed vehicle on Jose's policy. Jose's policy, which had policy limits of $15,000, had been canceled approximately six months before the accident.

C. The Two Reports of the Accident

*Saul's Report (CAIC Claim No. 20070032006723-81)*

Late on the afternoon of October 23, 2007, CAIC first learned of the accident when Saul contacted an adjuster working for CAIC to report he had been in an accident in the early morning hours of October 21, 2007. Saul reported he fell asleep while driving and had struck a woman and injured her. Saul's claim was handled by the adjusters of the Vista claims unit, and CAIC immediately began investigating this claim. CAIC contacted the California Highway Patrol (CHP) that same day to order a copy of the police report and, at that time, learned the actual date of the accident was October 20, 2007. CAIC also contacted the tow yard the following day and learned the CHP had an "evidence hold" on the Cadillac, which would require permission from the CHP to allow CAIC to inspect it.

Based on the preliminary information, CAIC believed the driver was 100 percent at fault. By October 30, 2007, CAIC's adjuster believed it would likely be an "excess

3

bodily injury claim," meaning the amount for which Saul was liable would exceed the amount of coverage provided by CAIC's policy. However, CAIC apparently did not know at that point the identity of the person injured by Saul.

*Graciano's Report* (*CAIC Claim No. 20070065006697-01*)

Three days after Saul's report, Ms. DeDominicis contacted a CAIC call center in Texas to report her client (Graciano) had been injured by a driver insured by CAIC. DeDominicis reported Graciano was injured on October 21, 2007, gave the call center "AP00297623" as the driver's policy number with CAIC, and told CAIC the driver's name was "Saulay Ala."[2]

CAIC assigned this report to a different claim identification number (claim No. 20070065006697-01), which identified Jose as the insured and identified his last effective policy number as AP00401514.[3] Graciano's claim was assigned to the La Mesa claims unit. The La Mesa claims unit transferred Graciano's claim to the Factfinder unit in Sacramento, which did coverage investigations, because the listed policy (policy No. AP00401514) appeared to have been canceled before the date of the accident and the Factfinder unit needed to determine whether policy No. AP00401514 had validly been

---

[2] Graciano's sister-in-law provided the name "Saulay Ala, Jr.," along with "AP00297623" as the driver's policy number, to DeDominicis when she began acting as Graciano's attorney. Graciano's sister apparently obtained that name and policy number from the CHP.

[3] Jose had previously been insured under the policy identified by DeDominicis (i.e., policy No. AP00297623) but, in March 2007, that policy had been canceled and a new policy immediately replaced it that insured Jose and bore the new policy number of AP00401514.

4

canceled. Ms. Talley of the Factfinder unit attempted to contact Jose without success, requested the underwriting file, and also confirmed it appeared Jose's policy had been canceled in April 2007. Talley also corresponded with DeDominicis on November 1, 2007, to inform DeDominicis it was investigating a "coverage problem" for Jose under policy No. AP00401514 and had been unable to confirm coverage. Talley also spoke with DeDominicis on November 6, 2007, confirming the coverage investigation was still ongoing but had not been completed.

   D. <u>Graciano's Demand Letter</u>

  On November 5, 2007, DeDominicis mailed a demand letter to Talley. The letter identified Jose as the "named insured," the policy as "Policy # AP00401514," the "Date of Loss [as] October 21, 2007," and described Graciano's extensive injuries. DeDominicis stated she had been retained to pursue Graciano's remedies "arising out of an event in which *your above-referenced insured and/or their vehicle* struck [Graciano]." (Italics added.) DeDominicis stated that, considering Graciano's extensive injuries:

> "demand is made that Mercury immediately provide a copy of the declaration page and payment of the maximum bodily injury policy limits to Mrs. Graciano. [¶] **The offer to settle for verified policy limits shall expire within ten days of today's date, and shall not be renewed**. [¶] Thereafter, Mrs. Graciano shall take the position that Mercury is responsible for any extra-policy judgment that is certain to be rendered . . . . [¶] If there is anything else you need to consider and respond in a timely fashion to this policy limit demand, please do not hesitate to call **immediately**. . . ."

That letter was not received by Talley until November 8.

5

The previous day, Talley first received the police report of the incident. The police report correctly reflected Saul was the driver but still listed Jose's old policy (i.e., policy No. AP00297623) as the applicable insurance policy.[4]

E. CAIC's Response to the Demand for Jose's Policy Limits

In the late afternoon of Thursday, November 8, 2007, although its initial investigation indicated Jose's policy had been canceled for underwriting reasons, CAIC nevertheless requested DeDominicis grant an extension on Graciano's demand for a policy limits settlement to give it time to complete its coverage investigation before responding to her demand. DeDominicis refused CAIC's request.

By Monday, November 12, CAIC's investigation of Graciano's report and claim had determined Saul, whom the newly obtained police report listed as the driver who struck Graciano, was a "non-listed driver" on Jose's policy and, according to the police report, did not reside at Jose's address. However, CAIC was still concerned Saul could have been the son of the named insured, even though Saul's address did not match that of Jose. That day, CAIC again tried, without success, to speak with DeDominicis about Graciano's claim.

On November 14, 2007, CAIC responded to DeDominicis's "policy limit demand" on Jose's policy and informed her that its preliminary investigation over the preceding seven days, although not yet complete, made it appear that Jose's policy was not in force

_____

4    Although Graciano's brief on appeal states the police report received by CAIC listed "Saul Ayala as the driver . . . *with his* [*CAIC*] *policy number*" (italics added), the police report contains no reference to Saul's policy No. 040115180005897 and instead listed only Jose's old policy number as the applicable insurance policy.

6

at the time of the accident, and therefore CAIC could not accept DeDominicis's policy limit demand before the November 15, 2007, deadline. CAIC cautioned that its determination was not final, but did advise Graciano to pursue her Uninsured Motorist coverage with her own insurer.

F. CAIC Connects Saul's Report With Graciano's Report and Offers Policy Limits

On the late afternoon of November 14, Talley of the Factfinder unit again called Jose to inform him the claimant was seriously injured and might pursue Jose. Talley also left messages with the driver named in the police report, Saul, to ask whether Saul had any insurance. However, Talley did not at that time know whether Saul had any insurance, much less that he had insurance with CAIC.

Shortly after noon the following day, Talley spoke on the phone with Saul, who told Talley he did have insurance and that his insurance was with CAIC. This was the first time Talley discovered a claim under Saul's name and policy had already been opened in the Vista claims unit. Talley immediately gave Graciano's claim and demands to the persons in the Vista claims unit handling Saul's claim. Around 1:45 p.m., an adjuster in the Vista claims unit contacted DeDominicis to explain they were the unit handling Saul's claim and had just found out that Graciano was the person whom Saul had reported he had injured, and asked DeDominicis for a 24-hour extension to respond to her settlement demand. DeDominicis refused and stated that if CAIC could not "get its act together on what policy handles what, it's not her problem." The adjuster immediately forwarded his recommendation to the Vista claims supervisor, who

7

recommended CAIC make a full policy limits offer on Saul's policy to settle Graciano's claims against him, and the supervisor immediately approved this offer.

CAIC immediately prepared a letter offering $50,000, which it identified as the full policy limits on Saul's policy, in full and final settlement of Graciano's injury claim. The letter specified the settlement would include any lien claims (noting the hospital at which Graciano was treated would have a statutory lien) and any loss of consortium claims, and asked DeDominicis to advise whether Graciano was married. Graciano stipulated DeDominicis received CAIC's settlement offer letter before the deadline of her demand on Jose's policy expired.[5]

Graciano did not accept CAIC's offer to settle her claims against Saul. Instead, she pursued her action against Saul.[6] Graciano obtained a judgment against Saul for over $2 million and obtained an alleged assignment of Saul's rights against CAIC.

---

[5]     However, CAIC was also prepared to prove that CAIC tried twice to reach DeDominicis by phone before the deadline expired to orally convey the offer, but she did not answer. Before preparing and sending the letter offer, CAIC's adjuster apparently called DeDominicis to convey the offer, but was only able to reach her voicemail. She left a message conveying CAIC's policy limits offer and asked that DeDominicis return her call. She also tried to reach DeDominicis by phone around 4:30 and again was unsuccessful. CAIC also sought to show it tried to fax the letter to DeDominicis at 3:21 p.m., at 3:28 p.m., and again at 4:08 p.m., but the fax failed on each occasion because DeDominicis had turned off her fax machine. Because Graciano stipulated DeDominicis timely received the letter, the court excluded this evidence pursuant to Graciano's motion in limine.

[6]     DeDominicis had filed an action, naming Saul, Saul's wife, and Saul's corporation, approximately one week before the expiration date set forth in Graciano's demand letter on Jose's policy. However, because of the court's in limine rulings, that evidence was excluded from the jury's consideration.

G. The Other Admitted and Excluded Evidence

Graciano introduced evidence that CAIC could have more promptly obtained the police report, or at a minimum could have more promptly obtained the "face pages" from the police report of the accident, but negligently did not do so. Had CAIC earlier obtained these pages, it would have earlier learned the driver's identity. Once the driver's identity was known, CAIC could have searched its computers to determine whether CAIC insured the driver.

Although the Factfinder unit did receive the police report on November 7, and therefore knew Saul was the driver, no one in the Factfinder unit searched its computerized database under "Saul Ayala" to determine if he was insured by CAIC. Had anyone conducted that search, they could have earlier learned he was insured by CAIC, and this could have led the Factfinder unit to learn of the claim Saul had opened two weeks earlier being processed by the Vista claims unit.[7] Additionally, the Factfinder unit had (by November 12) made a preliminary determination that Jose's policy had expired and therefore there was no coverage, and at that time the supervisor noted (among other tasks to be performed) someone should contact Jose to determine if he had any "excess" coverage that might be applicable, and also "verify if [Saul] has his own insurance."

_____

[7]  The Vista claims unit supervisor apparently received an "ISO ClaimSearch Automatic Update" on November 14 that indicated there were at least two claims arising out the accident. The claim number assigned to Graciano's claim on Jose's policy did appear in that update, but the "claimant" was listed as Saul and Graciano's name did not appear on this ISO ClaimSearch Automatic Update. By the following day, this confusion was resolved and the two claims had been consolidated by CAIC.

These calls to Jose and Saul were made two days later, and when Saul returned this call the next day, Talley first learned of his insurance with CAIC.

When CAIC tendered their policy limits on November 15, it was unaccompanied by either a check or by the declarations page for Saul's policy. This offer was also subject to the conditions that the policy limits offer of settlement would include (1) any loss of consortium claim and (2) all lien claims "known and unknown."[8]

The court excluded evidence proffered by the defense to support its argument that DeDominicis's offer to settle for the policy limits was not a genuine offer and that, once CAIC informed her that it appeared there was no coverage under Jose's policy, its

---

[8] CAIC's offer observed that "Palomar Medical Center [the hospital at which Graciano was treated] will have a statutory lien." Although Graciano's evidence showed CAIC had not yet placed a "lien stamp" on either of the claim files indicating a notice of the statutory hospital lien had been *received*, CAIC could not have at that time known whether the statutory lien nevertheless had become effective, because a lien apparently would have been effective (and Saul would have potential liability to Palomar Hospital under Civ. Code, § 3043.4) had the lien notice been "*mailed* by registered mail . . . prior to the payment of any moneys to the injured person" by Saul or his insurer. (Civ. Code, § 3045.3, italics added.) Thus, at the time of the offer, CAIC could not "rule out the potential of a hospital lien from Palomar hospital." Also, considering the compressed time frame, in which the only contact between the Vista claims unit and DeDominicis was a short phone conversation in which DeDominicis declined CAIC's request for an extension, the Vista claims unit could not have excluded potential loss of consortium claims against its insured because DeDominicis's letters described her client as *Mrs*. Graciano. Regardless, Graciano cites no law suggesting an insurer can be held liable for bad faith failure to settle if it makes a "full policy limits" offer and conditions the offer on a full resolution of all potential claims against its insured, and the law appears to be to the contrary. (Cf. *Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 871 (*Merritt*) ["Patently, the carrier cannot settle its share of the assured's liability and turn the assured adrift, exposed to a suit for excess liability financed by the carrier's settlement."]; accord, *State Farm Mut. Auto. Ins. Co. v. Crane* (1990) 217 Cal.App.3d 1127, 1136 (*Crane*) ["[T]he insurer is authorized to settle lawsuits, not to pay unilaterally the policy limits to a plaintiff. Moreover, it is generally recognized that such an unconditional payment, which has the effect of bankrolling a plaintiff's case against the insured, is not made in good faith."].)

subsequent efforts to settle on behalf of Saul were hampered by DeDominicis's machinations. For example, although DeDominicis knew (not later than November 7, 2007) that the driver's name was Saul Ayala, Jr., her November 5 demand letter, as well as her November 7 letter enclosing Graciano's medical bills and her November 8 letter reiterating the November 15 deadline for CAIC to respond, continued to refer solely to Jose and Jose's policy number without any mention of Saul. Additionally, the court excluded evidence that CAIC tried to reach DeDominicis telephonically on the afternoon of November 15 to convey the offer to settle, but those calls went unanswered, and excluded evidence that CAIC's efforts to fax the offer of policy limits during this same time frame were prevented because DeDominicis had (in a departure from ordinary procedures) turned her fax off. (See fn. 5, *ante*.)

## II

## PROCEDURAL HISTORY

Graciano disregarded CAIC's full policy limits offer and instead pursued her previously filed action against Saul. She obtained a judgment of over $2 million and obtained a partial assignment of Saul's rights against CAIC to pursue the present action.

The present action alleged a claim for insurance bad faith based on CAIC's alleged unreasonable refusal to settle Graciano's claim against Saul. The jury returned a verdict in Graciano's favor, and CAIC timely appealed.

11

APPLICABLE LEGAL STANDARDS

A. Substantive Standards

Because this action was limited to a claim that CAIC breached its duties to Saul by not taking reasonable steps to settle Graciano's claim against him, we outline the principles applicable to the claim.

"In each policy of liability insurance, California law implies a covenant of good faith and fair dealing. This implied covenant obligates the insurance company, among other things, to make reasonable efforts to settle a third party's lawsuit against the insured. If the insurer breaches the implied covenant by unreasonably refusing to settle the third party suit, the insured may sue the insurer in tort to recover damages proximately caused by the insurer's breach." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 312.) The standard of good faith and fairness examines the reasonableness of the insurer's conduct, and mere errors by an insurer in discharging its obligations to its insured " 'does not necessarily make the insurer liable in tort for violating the covenant of good faith and fair dealing; to be liable in tort, the insurer's conduct must also have been *unreasonable*. [Citations.]' " (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 819; accord, *Walbrook Ins. Co. v. Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1460 ["so long as insurers are not subject to a strict liability standard, there is still room for an honest, innocent mistake"]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1280-1281 ["The law clearly states that erroneous denial of

a claim does not alone support tort liability; instead, tort liability requires that the insurer be found to have withheld benefits unreasonably."].)[9]

An insured's claim for bad faith based on an alleged wrongful refusal to settle first requires proof the third party made a reasonable offer to settle the claims against the insured for an amount within the policy limits. (*Merritt, supra,* 34 Cal.App.3d at p. 877.) The offer satisfies this first element if (1) its terms are clear enough to have created an enforceable contract resolving all claims had it been accepted by the insurer (*Coe v. State Farm Mut. Auto. Ins. Co.* (1977) 66 Cal.App.3d 981, 992-993 (*Coe*)), (2) all of the third party claimants have joined in the demand (*ibid.*), (3) it provides for a complete release of all insureds (*Strauss v. Farmers Ins. Exchange* (1994) 26 Cal.App.4th 1017, 1021), and (4) the time provided for acceptance did not deprive the insurer of an adequate opportunity to investigate and evaluate its insured's exposure. (*Critz v. Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 798 (*Critz*) [One-week limitation attached to settlement offer does not preclude a finding of bad faith rejection where insurer's investigation and evaluation of claim had been completed; claimant "had a right to attach a time limit to her offer, but the insurer was not bound by it. [Citation.] Had the

_____

[9] We recognize that *Brandt* and *Tomaselli*, as well as many other cases on which we rely, involved insurers who allegedly breached the implied covenant of good faith and fair dealing in the context of "first party" coverage claims, whereas the present case involves an alleged breach the implied covenant of good faith and fair dealing in the context of "third party" coverage. However, the controlling principles have equal applicability in both contexts. (See, e.g., *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1241, fn. 8 ["Although the question whether an insurer failed to accept a reasonable settlement offer within policy limits of a third party claim against its insured is analytically distinct from the question whether an insurer unreasonably withheld benefits due under the policy in a first party coverage context [citation], *both turn on the reasonableness of the insurer's position* . . . ."].)

13

company needed more time for investigation, for a good faith assessment of the claim's value or for consultation with its policyholder, it might have chosen neither to accept nor reject her offer, but rather to suggest additional time."], disapproved on other grounds in *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 433.)

A claim for bad faith based on an alleged wrongful refusal to settle also requires proof the insurer unreasonably failed to accept an otherwise reasonable offer within the time specified by the third party for acceptance. (*Critz, supra,* 230 Cal.App.2d at p. 798.) However, when a liability insurer *timely* tenders its "full policy limits" in an attempt to effectuate a reasonable settlement of its insured's liability, the insurer has acted in good faith as a matter of law (*Crane, supra,* 217 Cal.App.3d at p. 1136; accord, *Boicourt v. Amex Assurance Co.* (2000) 78 Cal.App.4th 1390, 1400) because "by offering the policy limits in exchange for a release, the insurer has done all within its power to effect a settlement." (*Lehto v. Allstate Ins. Co.* (1994) 31 Cal.App.4th 60, 73.)

B. Standard of Review

When a verdict is challenged for lack of substantial evidence, we must determine whether there is evidence that is " ' "reasonable in nature, credible, and of solid value; [constituting] 'substantial' proof of the essentials which the law requires in a particular case." [Citations.]' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.) "In evaluating the legal sufficiency of the evidence, the following basic approach is required: 'First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is

14

commonly stated that our "power" begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. The Court of Appeal "was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review." [Citation.] "[I]f the word 'substantial' [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable . . . , credible, and of solid value . . . ." [Citation.]' " (*Valenzuela v. State Personnel Bd.* (2007) 153 Cal.App.4th 1179, 1184-1185, quoting *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.) "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.] While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Kuhn,* at p. 1633.)

When a claim is based on the insurer's bad faith, alleging either the insurer unreasonably refused to pay policy benefits or did not conduct an adequate investigation, the ultimate test is whether the insurer's conduct was unreasonable under all of the circumstances. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346.) Although "the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the

evidence is undisputed and only one reasonable inference can be drawn from the evidence." (*Ibid*.)

IV

ANALYSIS

A. There Is No Substantial Evidence CAIC Unreasonably Rejected an Offer to Settle Saul's Liability

An insured's claim for "wrongful refusal to settle" cannot be based on his or her insurer's failure to *initiate* settlement overtures with the injured third party (*Reid v. Mercury Ins. Co.* (2013) 220 Cal.App.4th 262, 277 ["nothing in California law supports the proposition that bad faith liability for failure to settle may attach if an insurer fails to initiate settlement discussions, or offer its policy limits, as soon as an insured's liability in excess of policy limits has become clear"]), but instead requires proof the third party made a reasonable offer to settle the claims against the insured for an amount within the policy limits. (*Merritt, supra,* 34 Cal.App.3d at p. 877.) We conclude there is no substantial evidence Graciano ever offered to settle her claims *against Saul* for an amount within *Saul's* policy limits.

The only settlement "offer" CAIC could have accepted was DeDominicis's November 5, 2007, letter. It identified *Jose* as the named insured, the relevant policy as *Jose's policy* (e.g. "Policy # AP00401514"), and (after describing Graciano's extensive injuries) stated DeDominicis had been retained to pursue Graciano's remedies "arising out of an event in which *your above-referenced insured and/or their vehicle* struck [Graciano]" (italics added), and demanded that CAIC "immediately provide a copy of the

16

declaration page and payment of the maximum bodily injury *policy limits . . . ."* (Italics added.) Even assuming (as Graciano contends on appeal) the letter implicitly contained an agreement to release "the above referenced insured" in exchange for the "policy limits" of the referenced policy, the plain import of this letter is that Graciano offered *only* to settle her claims against Jose.[10] Because Graciano never demanded payment of *Saul's* policy limits in exchange for a release of *Saul's* liability, Saul would not have been protected even had CAIC accepted the terms of Graciano's demand.

Graciano cites no authority that an offer to release one potentially liable party (here, Jose) in exchange for that party's policy limits, if rejected by the insurer, can serve as the basis for a "wrongful refusal to settle" claim by a different potentially liable party (here, Saul), and analogous authorities suggest a contrary rule. In *McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, the injured party made a settlement demand that was apparently within policy limits, but the offer contained no

---

[10]     Graciano appears to argue the November 7 letter *did* demand Saul's policy limits because it "demand[ed] the policy limits of Mercury's '*insureds*' [and] nowhere refers to the policy limits of Jose" and therefore was "obviously referring to Saul." We reject Graciano's argument to the extent it suggests that a third party claimant, after specifically identifying a named insured and his or her policy number, may demand the policy limits of a company's "insureds" and by such plural reference thereby widen the net to make a demand encompass the universe of unidentified persons and entities who have coverage with the insurer and who may have potential liability for the accident. For example, had Saul been under 21 years of age and been furnished alcohol by a social host (against whom Graciano apparently would have a claim) (Civ. Code, § 1714, subd. (d)) and the host happened to be insured by CAIC, Graciano's theory would expose CAIC to a wrongful refusal to settle claim by that social host for failing to discover the policy and proffer to the social host's policy limits in response to Graciano's demand on Jose's policy. We decline to adopt a rule that a settlement demand seeking the policy limits of a specifically identified insured may, simply by employing the plural term "insureds," constitute a demand seeking the policy limits of the universe of persons and entities with whom an insurer may have issued policies.

17

suggestion the injured party would release the insured, and the *McLaughlin* court rejected the argument that such offer could support the verdict against the insurer for wrongful refusal to settle. (*Id*. at p. 1145, fn. 5.) Similarly, in *Strauss v. Farmers Ins. Exchange, supra,* 26 Cal.App.4th 1017, the plaintiff's demand for policy limits did not include an offer to release *all* of the insureds, and the court concluded rejection of such an offer could not support an action for wrongful refusal to settle. (*Id*. at pp. 1020-1022.) Finally, in *Coe, supra,* 66 Cal.App.3d 981, the court concluded the insurer's failure to accept the plaintiff's settlement demand could not provide a basis for a wrongful refusal to settle the claim because it would *not* have released the insured from *all* potential claims. (*Id*. at pp. 992-993.)

Graciano argues these cases do not support reversal because claimants are not required "to begin settlement overtures with letter-perfect offers to which insurers need only respond 'Yes' or 'No.' An insurer's duty of good faith would be trifling if it did not require an insurer to explore the details of a settlement offer that could prove extremely beneficial to its insured." (*Allen v. Allstate Ins. Co.* (9th Cir. 1981) 656 F.2d 487, 490, fn. omitted; see *Betts v. Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 708, fn. 7 [noting in dicta that where insurer deems settlement offers ambiguous or incomplete it should attempt to seek clarification rather than rejecting offer].) Indeed, Graciano's argument on appeal is that *McLaughlin* and *Strauss* are distinguishable because her November 7 letter never refused to release Saul; by the same token, however, neither did her November 7 letter ever offer *to* release Saul in exchange for Saul's policy limits. Graciano also suggests that, even if there was some ambiguity as to whether Saul would have been

18

encompassed in her settlement demand, "if [CAIC] had contacted Ms. DeDominicis before the settlement expiration date to verify her client would sign releases, as did the insurer in *Coe*, that issue could have been resolved." This argument, however, ignores the undisputed evidence CAIC *did* contact Ms. DeDominicis *before* the settlement expiration date to inquire whether her client *would* agree to release Saul in exchange for his policy limits, and those inquiries were rebuffed.

Graciano alternatively argues that, even assuming the November 7 demand letter incorrectly identified the insured and the applicable policy number, those defects were attributable to CAIC because it was CAIC that, in response to Graciano's report of the injury, changed the driver's name from "Saulay Ala" (as reported by DeDominicis) to Jose. Graciano argues it is CAIC—not a third party—who is obligated to investigate claims against its insured, and therefore any defect in her demand letter must be attributed to CAIC's default of their obligations. However, the undisputed evidence is that CAIC *did* comply with its obligations to investigate potential coverage on this reported claim, because once CAIC received *this* report from Graciano (which tied her claim to an apparently canceled policy) it tried to contact Jose, immediately began investigating whether the policy had been validly canceled, and kept Graciano apprised of its progress. The defect in her demand letter thus had its genesis in the defect in DeDominicis' first report of Graciano's claim, and was not impacted by the investigation undertaken by the Factfinder unit in response to her initial claim.

Graciano attempts to bring the circumstances of this case under the aegis of *Safeco Ins. Co. of America v. Parks* (2009) 170 Cal.App.4th 992 (*Safeco*), arguing that an insurer

19

is charged with constructive knowledge of its own insuring agreements and, if it fails to search for, discover and disclose potential coverage under a policy other than the one under which the claim is made, it can be held liable for wrongful failure to defend and to settle. However, even under the analysis of the *Safeco* court,[11] we are unpersuaded that case supports the judgment here.

Our reason for rejecting Graciano's reliance on *Safeco* requires a nuanced understanding of the facts presented to, and the resulting analysis by, the *Safeco* court. There, the victim (Parks) sued three tortfeasors, including Miller, for injuries he sustained in 1999 when he was struck by a third person after Miller and the others left Parks at the side of a road. (*Safeco, supra,* 170 Cal.App.4th at p. 998.) Miller, a minor, lived with her father and grandmother in a condominium rented by the grandmother. Miller's mother was living with Mr. Barnette, who had a homeowner's insurance policy issued by Safeco, and Miller occasionally stayed with her mother at Barnette's house. (*Ibid.*) Miller tendered her defense to Safeco under the homeowner's policy issued to Barnette (the Barnette policy), but Safeco declined the defense (*ibid.*), apparently contending an automobile exclusion precluded coverage for this accident. (*Id.* at p. 1004.) In a subsequent action, Parks recovered a judgment against Miller, who settled with Parks by

---

11    The *Safeco* court itself cautioned that, "[*i*]*n this unusual context*, we conclude [insurer's] failure to conduct a reasonable search for other Safeco policies breached duties arising under the [other] policy to reasonably investigate and settle [the claim]" and concluded the insurer could not breach its duty to conduct a reasonable investigation and then use the resulting ignorance "to shield itself from liability for breach of the related duty to accept a reasonable settlement demand." (*Id.* at p. 1009, italics added.) Even assuming we were to agree with all aspects of the analysis of the *Safeco* court, we would limit that case to the peculiar facts and the self-described "unusual context" presented in *Safeco*.

20

assigning to him any claims she might have against Safeco and, in 2002, Parks sued Safeco to recover the judgment he obtained against Miller (the bad faith action). He alleged that Safeco breached the Barnette policy by refusing, in bad faith, to defend Miller under the Barnette policy and to settle within the limits of that policy. (*Id.* at p. 998.) Sometime later, apparently in 2003 and well after Parks's bad faith action was filed, Miller's father asked her grandmother (Evelyn) whether she had any insurance on her condominium and discovered Safeco insured Evelyn under a renter's insurance policy (the Evelyn policy). Miller's father then gave the Evelyn policy to Miller or to her lawyer. (*Id.* at p. 999.)

In a bifurcated proceeding in the original bad faith action, the trial court entered a declaratory judgment in favor of Parks, finding Safeco had a duty to defend and to indemnify Miller because she was an insured under the Barnette policy. However, Safeco appealed and, in 2004, the appellate court reversed and held Safeco had no duty to defend Miller under the Barnette policy because she was not an insured under that policy. (*Safeco, supra,* 170 Cal.App.4th at p. 999.) Thereafter, Parks's counsel demanded Safeco pay the policy limits under the Evelyn policy, and the adjuster for Safeco (within a week of receiving the demand letter) concluded Miller *was* an insured under the Evelyn policy and that its automobile exclusion did *not* preclude coverage. Parks then amended his bad faith action to allege for the first time that Safeco had a duty under the Evelyn policy to pay the judgment and that it breached the implied covenant of good faith by refusing to defend or indemnify Miller under that policy. (*Id.* at pp. 999-1000.) The trial court ultimately concluded Safeco had breached the implied covenant of good faith by refusing

21

to defend or indemnify Miller based on a policy (the Evelyn policy) under which Miller had never sought a defense. (*Id*. at p. 1000.)

The lynchpin of the *Safeco* court's analysis, upon which the balance of its remaining holdings depended, was its discussion of the insurer's claim that its duty of good faith and fair dealing under the Evelyn policy "never arose because . . . Miller tendered her defense only under the Barnette policy and there was no evidence Safeco had actual knowledge of the [Evelyn] policy when it declined the defense." (*Safeco, supra,* 170 Cal.App.4th at p. 1003, fn. omitted.) The *Safeco* court, after noting the duty of good faith and fair dealing includes a duty on the part of the insurer to investigate claims submitted by its insured, specifically noted that the "duties, however, arise after the insured complies with the claims procedure described in the insurance policy. [Citations.] '[W]ithout actual presentation of a claim by the insured in compliance with claims procedures contained in the policy, there is no duty imposed on the insurer to investigate the claim.' [Quoting *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 57 (*California Shoppers*).]" (*Safeco*, at p. 1003.) However, the *Safeco* court noted the insured's failure to comply with the notice or claims provisions will *not* excuse the insurer's obligations under the policy

> "unless the insurer proves it was substantially prejudiced by the late notice. [Citations.] 'Prejudice is not presumed from delayed notice alone. [Citations.] The insurer must show actual prejudice, not the mere possibility of prejudice.' [Quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 761.] Where, as here, the insurer denies coverage, *it may establish substantial prejudice only by demonstrating that, 'in the event that a timely tender of the defense* [*in the underlying action*] *had been made, it would have undertaken the defense*.' [Quoting *Clemmer v. Hartford Insurance*

22

*Co.* (1978) 22 Cal.3d 865, 883.] 'If the insurer asserts that the underlying claim is not a covered occurrence or is excluded from basic coverage, then earlier notice would only result in earlier denial of coverage. *To establish actual prejudice, the insurer must show a substantial likelihood that, with timely notice*, and notwithstanding a denial of coverage or reservation of rights, *it would have settled the claim . . . .*' [Quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at p. 763.]" (*Safeco, supra*, 170 Cal.App.4th at p. 1004, italics added.)

The *Safeco* court then concluded the "notice defense" was correctly rejected by the trial court (on a motion for summary adjudication) and later by the jury because the insurer did not establish it had been prejudiced by the delayed notice, reasoning Safeco had attempted to justify its rejection of coverage under the Barnette policy by asserting its automobile exclusion precluded coverage for this accident, and "Safeco now relies on the same automobile exclusion to contend there was no potential for coverage under the substantially identical [Evelyn] policy. As a result, both the trial court and the jury could reasonably infer that Safeco was not prejudiced by the late notice because it would have relied on the automobile exclusion to decline the defense under the [Evelyn] policy." (*Safeco, supra*, 170 Cal.App.4th at p. 1004.)

Here, in contrast, there is no evidence Graciano's misidentification of the applicable policy in her settlement demand did not cause prejudice to CAIC, because there is no evidence CAIC would have relied on the *same* basis for declining to pay the policy limits on Saul's policy (had Graciano correctly submitted her claim under Saul's policy) as it cited when it declined her request for the policy limits under Jose's policy. To the contrary, the only evidence in the record is that Graciano's misidentification of the applicable policy *did* cause " 'actual prejudice [because] the insurer . . . show[ed] a

23

substantial likelihood that, with timely notice, . . . it would have [attempted to] settle[] the claim . . . .' " (*Safeco, supra*, 170 Cal.App.4th at p. 1004.) The undisputed evidence showed CAIC rejected Graciano's request for the policy limits under the misidentified policy because it had expired but, once it learned of the applicable policy, it did not decline coverage for the *same* reason (or for *any* reason) but instead proffered the full policy limits in an attempt to protect its insured. We are convinced *Safeco* does not support the verdict here.

Moreover, *Safeco* provides no support for Graciano's argument for a second reason: the *same conduct* the *Safeco* court opined *should* have been undertaken by the insurer (and whose absence supported the wrongful failure to settle verdict there) *was* undertaken by CAIC here. Once the *Safeco* court concluded Miller's misidentification of the applicable policy caused no prejudice to the insurer, and hence the insurer's duty to investigate was not excused, it concluded Safeco was obligated to investigate whether any other policy potentially covered her liability to the claimant, and its failure to investigate and discover the Evelyn policy led to the insurer's rejection of the policy limit demand. (*Safeco, supra*, 170 Cal.App.4th at p. 1005.) The *Safeco* court specifically noted the insurer determined Miller did not reside with her mother and therefore was not an insured under the Barnette policy, and declined coverage, and thereafter there was "no evidence [the insurer] ever searched its own files for potentially applicable Safeco policies issued to the adults with whom Miller resided[;] . . . [n]or did Safeco interview Miller's father or grandmother to determine whether they had Safeco policies that might cover her claim." (*Id*. at p. 1008.) Because this search or interview would have produced

24

the applicable Evelyn policy, the *Safeco* court concluded the absence of this search breached the insurer's duty to investigate and to attempt to settle Miller's liability. (*Id.* at p. 1009.) Here, in contrast, after CAIC determined the identified Jose policy did not cover Graciano's claim, it did not stop there: it *did* try to interview Jose and Saul to determine whether they had policies that might cover Graciano's claim, this search *did* discover another applicable policy, and CAIC *did* attempt to settle Saul's liability.

Because the undisputed evidence shows CAIC was actually prejudiced by the misidentification of the applicable policy, and also shows (notwithstanding the misidentification) CAIC undertook the type of continued investigation the *Safeco* court concluded was required, we reject Graciano's argument that there was substantial evidence under *Safeco* to support the verdict.

Graciano's argument under *Safeco* is not, at bottom, that CAIC did not conduct *any* effort to locate and provide coverage for Saul, but is instead an argument that there was substantial evidence CAIC "bungled its investigation" and, but for its errors, could have *sooner* discovered there was a policy providing coverage for her claim. Although this claim is true, it is also irrelevant. A bad faith claim requires "something beyond breach of the contractual duty itself" (*California Shoppers, supra,* 175 Cal.App.3d at p. 54), and that something more is " 'refusing, *without proper cause*, to compensate its insured for a loss covered by the policy . . . .' [Citation.] Of course, the converse of 'without proper cause' is that declining to perform a contractual duty under the policy *with proper cause* is not a breach of the implied covenant." (*Ibid.*, italics supplied by *California Shoppers.*) The *California Shoppers* court then noted that "[t]o refine further

25

the nature and extent of the duty here under analysis, in terms of a particular application of 'with proper cause,' it is our view that a *mistaken withholding* of policy benefits, at least where, as here, such mistake (as to the insured's identity and not as to the matter of coverage) has been contributed to by the very party claiming those policy benefits, is consistent with observance of the implied covenant of good faith and fair dealing because the mistake supplies the 'proper cause.' " (*Id*. at p. 55.) Applying *California Shoppers* here, although there *was* some delay by CAIC in locating and connecting Graciano's claim with Saul's policy, resulting in a mistaken "withholding" of policy benefits for a 24-hour period, such mistake was "contributed to by the very party claiming those policy benefits" and "supplies the 'proper cause' " (*ibid.*), fatal to Graciano's bad faith claim.

B. There Is No Substantial Evidence CAIC Unreasonably Failed to Timely Tender Saul's Policy Limits to Attempt to Settle Saul's Liability

A claim for "wrongful refusal to settle" requires proof the insurer unreasonably failed to accept an otherwise reasonable offer within the time specified by the third party for acceptance. (*Critz, supra,* 230 Cal.App.2d at p. 798.) The third party is entitled to set a reasonable time limit within which the insurer must accept the settlement proposal (*Martin v. Hartford Acc. & Indem. Co.* (1964) 228 Cal.App.2d 178, 185), and even a one-week limitation attached to a settlement offer does not preclude a finding of bad faith rejection under some circumstances. (*Critz,* at pp. 797-798 [insurer given one week to respond where claimant had not yet incurred costs of a retained attorney, company's investigation and evaluation was complete, and company never suggested it needed more time for investigation].) Although the insurer "need not be governed by whatever time

26

limit counsel for plaintiff in a personal injury action may impose" (*Martin,* at p. 185), whether the insurer has satisfied its duty to seek to settle in protection of its insured "must be measured in the light of the time limitation which plaintiff had placed on her offer." (*Ibid.*) When a liability insurer *does* timely tender its "full policy limits" in an attempt to effectuate a reasonable settlement of its insured's liability, the insurer has acted in good faith as a matter of law (*Crane, supra,* 217 Cal.App.3d at p. 1136) because "by offering the policy limits in exchange for a release, the insurer has done all within its power to effect a settlement." (*Lehto v. Allstate Ins. Co., supra,* 31 Cal.App.4th at p. 73.)

Here, in the three weeks after it first learned Graciano was alleging someone insured by CAIC had injured her, CAIC was able to (1) determine that the policy identified by Graciano (Jose's policy) could *not* provide a source of compensation for her, (2) identify that a person (Saul) *different* from the one identified by Graciano ("Saulay Ala") was responsible for Graciano's injuries, (3) determine Saul *did* have a policy available as a source of compensation, and (4) tender CAIC's "full policy limits" in an attempt to effectuate a settlement of Saul's liability. Although there was substantial evidence from which a jury could have concluded CAIC was able to resolve the confusion engendered by Graciano's misidentification of the applicable insured and insurance policy *earlier* than it did, and to offer to settle earlier than it did, perfection is not required (see, e.g., *Adelman v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 352, 369 ["to recover in tort for an insurer's mishandling of a claim, it must allege *more*

27

than mere negligence"]), and Graciano's evidence showed, at most, that CAIC could have resolved the confusion more promptly.[12]

More importantly, the undisputed evidence showed CAIC did timely tender Saul's full policy limits in an attempt to settle Graciano's claim, and therefore acted in good faith as a matter of law "by offering the policy limits in exchange for a release [thereby doing] all within its power to effect a settlement." (*Lehto v. Allstate Ins. Co., supra,* 31 Cal.App.4th at p. 73.) Although Graciano argues the evidence could have permitted a trier of fact to conclude the tender of Saul's policy limits was *not* timely, Graciano herself selected November 15 as the deadline for offering full policy limits in settlement. Although an injured third party's unilateral selection of a deadline does not conclusively govern whether a *later* tender of policy limits would have been *untimely* (*Martin, supra,* 228 Cal.App.2d at p. 185), we conclude at a minimum that the insurer *has* satisfied its

---

12    Graciano asserts the evidence showed CAIC was negligent and cites *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911 for the proposition that such evidence can be circumstantial evidence of bad faith. However, *Notrica* recognized that mere negligence does *not* constitute bad faith and instead held that evidence of negligent mishandling of claims such as those of the plaintiff, " '*if shown as a pattern*, clearly would be strong circumstantial evidence that SCIF indeed engaged in the complained of conduct.' " (*Id*. at p. 931, italics added.) On appeal, Graciano cites the evidence showing CAIC could have earlier obtained the police report showing Saul was the driver and, when it did receive that report, could have phoned Saul earlier (but did not) or searched its computer database to determine whether Saul was an insured. However, Graciano has not directed this court's attention to evidence in the record demonstrating such defalcations were part of a *pattern* by CAIC's claims handling department when dealing with claims like Graciano's claim. (Cf. *Estate of Allen* (1971) 17 Cal.App.3d 401, 405, fn. 2 [when respondent claims judgment is supported by substantial evidence, " 'it is the duty of a respondent . . . to point out to the appellate court the evidence he deems sufficient to support such judgment' "].) Instead, the evidence cited on appeal by Graciano shows negligence in the handling of this specific claim, but that is not enough to support a verdict for bad faith. (*Adelman v. Associated Intern. Ins. Co., supra,* 90 Cal.App.4th at p. 369 ["more than mere negligence" required for tort claim].)

28

duty to seek to settle in protection of its insured when, "in the light of the time limitation which plaintiff had placed on her offer" (*ibid*.), the insurer tenders its full policy limits *within* the time limits imposed by an injured party's demand letter.

## DISPOSITION

The judgment is reversed.  Defendants shall recover their costs on appeal.


McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

29

Filed 11/12/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SONIA GRACIANO, | D061956 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00055207-CU-IC-NC) |
| MERCURY GENERAL CORPORATION et al., | ORDER DENYING REHEARING AND GRANTING MODIFICATION |
| Defendants and Appellants. | |

THE COURT:

The petition for rehearing is denied.

On the Court's own motion, the disposition is changed to read:

"The judgment is reversed. The trial court is directed to enter judgment on the complaint in favor of defendants. Defendants shall recover their costs on appeal.

There is no change in the judgment.

HUFFMAN, Acting P. J.

Copies to: All parties

Filed 11/12/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SONIA GRACIANO, | D061956 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00055207-CU-IC-NC) |
| MERCURY GENERAL CORPORATION et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants. | |

THE COURT:

The opinion filed October 17, 2014, is ordered certified for publication.

HUFFMAN, Acting P. J.

Copies to: All parties
James P. Wagoner
Clarke B. Holland
Peter H. Klee
Marc J. Feldman