Filed 8/11/21  Hedayati v. Interinsurance Exchange of the Automobile Club CA4/3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARYAM HEDAYATI, | |
| Plaintiff and Appellant, | G058189 |
| v. | (Super. Ct. No. 30-2016-00879169) |
| INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Reversed.

Lari-Joni & Bassell and Torsten M. Bassell for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, John T. Brooks, Karin Dougan Vogel, Thomas R. Proctor and Matthew G. Halgren for Defendant and Respondent.

\*          \*          \*

Maryam Hedayati appeals from the judgment entered against her after the trial court granted summary judgment to Interinsurance Exchange of the Automobile

Club (Auto Club or the Club) on Hedayati's breach of good faith and fair dealing claim. Hedayati suffered catastrophic injuries in October 2012 when Auto Club's insured ran a red light and struck her in a pedestrian crosswalk. The insured driver immediately notified Auto Club of the accident and authorized the Club to disclose his policy limits ($25,000); he also informed Auto Club he had no other insurance or assets. Auto Club's policy with its insured required him to relinquish to the Club his right to negotiate settlement of potential tort claims falling within the policy. When he inquired about a release, Auto Club inaccurately told its insured driver Hedayati was not willing to sign one.

Despite repeated requests during settlement negotiations from Hedayati's attorney, Auto Club initially declined to disclose the insured's policy limits; eventually it relented, but even then Auto Club declined to provide written proof of those limits, which the Club knew was common practice to facilitate a settlement. Auto Club then withheld from Hedayati's counsel the insured's written declaration which indicated he had no other insurance, which the Club had confirmed, and the insured's statements that he had no assets. Auto Club also, despite multiple requests from Hedayati's lawyer, failed to provide a copy of its insured's policy which Hedayati's lawyer needed to verify its terms. Hedayati's counsel had demanded a hard copy of the policy as a settlement condition. Auto Club ultimately failed to settle the matter within its $25,000 policy limits. Hedayati subsequently obtained a $26 million judgment against the insured driver, along with assignment of the insured's claim against the Club for breach of the covenant of good faith and fair dealing implicit in its policy with him.

Although it did not say so explicitly, the trial court's written summary judgment ruling indicates it concluded no reasonable trier of fact could find a breach of the covenant of good faith and fair dealing in the foregoing facts if plaintiff established them at trial. In other words, the court believed the evidence presented by Hedayati on this issue was insufficient as a matter of law. On appeal, we must view the record in the

2

light most favorable to the party opposing summary judgment. After our de novo review, we disagree with the trial court's evaluation of the evidence. We therefore reverse its summary judgment ruling and the judgment based on that ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

The October 2012 accident at issue here severed one of Hedayati's legs at the scene, shattered the other, and left her in a coma with broken bones throughout her body. Forty-three years old and a recent medical school graduate at the time, Hedayati was struck while walking as she took a break from studying for her medical board examinations. The insured, 45-year-old Maurice Vanwyk, reported the incident to the Auto Club the next day, on October 2, 2012.

The Auto Club intake person who took Vanwyk's call told him a claims representative would contact him for more details by the end of the day; the representative did so within 90 minutes. Within hours of receiving Auto Club's file concerning the accident, its mobile adjustor drove to Vanwyk's home to interview him personally.

The adjustor soon reported to Auto Club that Vanwyk "makes a very poor witness for himself." During that initial interview, the insured gave his signed "permission to release policy limits" so that Auto Club "could move quickly" to settle any potential claims if they exceeded his policy limits. Vanwyk admitted at that time eyewitnesses told him he ran a red light before he struck Hedayati. The adjustor immediately recognized, and explained to Vanwyk, that liability in excess of his policy limits was likely "due to his speed and hitting a pedestrian," "even if [we] accepted [only] a percentage of responsibility."

The adjustor's interview notes reflected that Vanwyk disclosed he had "NO other insurance, no homeowners or PUP [i.e., umbrella policy]. He does not own anything, no real property. He is currently unemployed and living with his parents."

3

Soon thereafter, and immediately upon reviewing the adjustor's report which included a newspaper account of the accident and a description of Hedayati's injuries, an Auto Club manager recorded on the company's notes: "Would appear that our $25K limit is gone."

Beginning about two weeks after the accident, while Hedayati remained unconscious and on life support, the attorney her family retained on her behalf repeatedly urged Auto Club by fax and telephone to "[s]eek your insured's authorization to disclose policy limits . . . ." Auto Club had already done so during the adjustor's initial contact with Vanwyk, but the Club refused to disclose the figure according to Hedayati's attorney.

The adjustor later provided notes suggesting he called the attorney sometime before 8:01 a.m. on the morning of October 19, 2012, to offer the policy limits "to settle Ms. Hedayati's claim." Hedayati's attorney categorically denied this. He testified he received no such call; he also denied the adjustor ever revealed the policy limits. Auto Club's records fail to confirm any October 19 settlement offer by the Club. The Club's record indicated only that by October 19, 2012, it had reassigned the claim from its mobile department, where the initial adjustor worked, to its casualty department which handled claimants who were represented by counsel.

That same day, October 19, 2012, the Club's casualty adjustor sent Hedayati's attorney a letter which included no mention of the mobile adjustor's alleged offer to settle the matter. Instead, the letter stated Auto Club would be contacting Vanwyk "to discuss his policy limit" and to "seek our insured's authorization to disclose [the] policy limit." The new adjustor also stated (1) she needed to contact the insured to "rule out any other insurance that may apply for this accident; (2) Auto Club's "liability determination is still under investigation"; and (3) that the adjustor would "contact[] you within the next 30 days to advise you of our investigation or evaluation of this claim . . . ."

4

The casualty adjustor located other Auto Club policies in Vanwyk's father's name but had determined by October 26, 2012, in consultation with the casualty team manager and other Auto Club personnel, those policies did not provide coverage for Vanwyk or otherwise apply to the accident.

The casualty adjustor met with Vanwyk on October 30, 2012. The adjustor prepared a declaration Vanwyk signed attesting that he was "not in the course and scope of employment at the time" of the accident. He also attested he did not have "an umbrella or excess insurance policy that would be applicable . . . ." He identified by its number his Auto Club policy. The adjustor later acknowledged she understood claimant attorneys "making a policy limit demand . . . always want to rule . . . out . . . any other insurance [¶] . . . [¶] before they can settle the claim." She also acknowledged that before a settlement can be reached, claimant attorneys "want a copy of the [policy] declaration page as evidence of what the insurance limits [are]."

The casualty adjustor drafted a letter to Hedayati's attorney on October 30, 2012, that included these settlement prerequisites. She had obtained that same day Vanwyk's declaration denying any other insurance and she further stated in her draft letter: "I [have] attached [a] copy of [the] declaration page of our insured's policy for your review." But she never sent that letter. Instead, on October 31, 2012 the adjustor sent Hedayati's lawyer a letter in which she purported to "confirm . . . in writing" an unidentified "previous settlement offer" made by Auto Club. The letter also stated, "Due to the nature and extent of your client's injury, Auto Club will tender our insured maximum policy limit of $25k to settle your client's injury claim," and directed Hedayati's attorney "to contact me if you have any further questions." According to Heyadati, through November 2012 Auto Club never provided the policy information he repeatedly requested, and never provided other required information, including a copy of the policy itself and reasonable release terms.

5

On November 12, 2012, the casualty team manager reviewed Auto Club's file concerning the claim and noted that "Cl[ai]m[an]t," i.e., Hedayati, "may be taken off life support and if so and [therefore] becomes [a] fatality[,] will need to secure dec[laration] of heirs, death cert[ificate] and release from proper heir to resolve." The manager stressed in his note on the file: "Will need to *resolve liability* and update Loss Details screen *and follow up with clmt atty re: settlement/release*." (Italics added.) Another week passed during which no release or other documents were transmitted to Hedayati's attorney.

On November 20, 2012, Hedayati's attorney sent Auto Club a letter offering to settle the matter for the insured's $25,000 policy limit. The letter specifically conditioned the offer on Auto Club furnishing the documentation that had been absent from Auto Club's October 31, 2012 letter. The conditional settlement offer required Auto Club to provide Hedayati's counsel with the insured's signed declaration confirming he was not "driving in the course and scope of his employment" at the time of the accident, and that "no other insurance coverage [is] available" to settle Hedayati's personal injury claims, other than Vanwyk's "Automobile Club policy, which only provides for $25,000.00 in per person policy limits." The offer also required that Hedayati's attorney receive a "true and correct copy of the Declaration Page and Insurance Policy for the underlying Auto Club policy that is the subject of this settlement." The offer further required the insured driver to attest that the "total amount of [his] assets and holdings is less than $200,000.00."

The November 20 settlement offer expressly stated that Auto Club could condition acceptance of the offer on the $25,000 settlement figure "being inclusive of any and all lien claims," including for Hedayati's health care and legal representation. The offer also specified that acceptance could be conditioned on court approval to verify the authority of "Claimant's guardian ad litem or conservator" to settle her claims and execute a release on her behalf. If so conditioned, Auto Club was to provide—"[w]ithin

6

7 days of your written acceptance" of the offer—any release "you require to be signed by the Guardian Ad Litem/Conservator." The offer specified that Hedayati was "a single, unmarried woman," thereby eliminating Vanwyk's exposure to a loss of consortium claim.

Counsel's November 20 settlement offer included this caveat: "Strict adherence to each and every term and condition of this offer is required for its acceptance. There can be no change in any of the terms and conditions of this offer." The November 20 letter also addressed Auto Club's "letter dated October 31, 2012, in which you indicate that Auto Club is offering $25,000.00 to settle . . . Hedayati's personal injury claim." "Unfortunately, we must reject the offer . . . because it fails to clearly set forth the exact terms and conditions upon which the offer was made." Hedayati's offer letter instead stated that "[i]f the maximum insurance coverage that is available to indemnify your insured(s) is $25,000.00, then Ms. Hedayati hereby offers to settle all of her claims for those policy limits on" the foregoing terms and conditions described above.

Finally, Hedayati's November 20 offer specified additional conditions, including that it had to be accepted in writing within a week: "Your written acceptance of th[is] settlement offer must be received by our office on or before Tuesday, November 27, 2012. The acceptance must be sent via UPS or Federal Express [FedEx] overnight mail with a tracking number to confirm its delivery." Hedayati's attorney sent the offer to Auto Club by a FedEx "Overnight Envelope" on November 20, 2012. The envelope was addressed to the adjustor handling the matter at Auto Club's Los Angeles office. FedEx's tracking service showed the package was delivered the next morning, on Wednesday, November 21, 2012, at 7:21 a.m. and "Signed for by: ANTHONY."

Auto Club's internal records did not reflect any action on Hedayati's settlement offer until after the offer had expired on November 27, 2012. The first entry in Auto Club's claims notes after November 21 was made by a clerical assistant at

7

2:49 p.m. on Wednesday, November 28, 2012: "Received file to copy—Copied file and all back to Aaron Meraz for handling."

Around 3:00 p.m. that same day, the Club's casualty adjustor called Hedayati's attorney to request, according to the attorney, "an extension of time to respond to the settlement demand." According to Hedayati's attorney, no indication was given that the Club intended to accept the offer—only that Auto Club wanted more time to formulate a response. Hedayati's attorney declined to grant the extension; instead he indicated "the settlement offer had already expired, without a response, the day before you called me . . . ." (Underlining omitted.) There was therefore no longer any offer to extend.

Among other documents Auto Club later provided Hedayati in discovery was the casualty team manager's calendar which reflected the following entry on the deadline date, Tuesday, November 27, 2012: "Leave early for DDS 1:00 p.m." The manager, Aaron Meraz, testified that if he had seen Hedayati's offer letter the morning it arrived on Wednesday, November 21, 2012, he "would have moved on it." Meraz offered no explanation for why no one at Auto Club responsible for Vanwyk's policy appeared to have seen or acted on Hedayati's offer for more than a week after it arrived.

According to Hedayati, based on internal Auto Club guidelines she obtained during discovery in this matter, Auto Club failed to comply with its own "Excess Policy Limits Handling Standards" for her claim. The guidelines stated they were "intended to address the most frequent and highest exposure situations." The standards included specific procedures for handling time-limited settlement offers. The guidelines are under seal in our record pursuant to Auto Club's request that they be treated as confidential trade secrets, which the trial court granted. We will therefore not describe them further, except to note they were part of the evidence Hedayati submitted to the trial court in her opposition to summary judgment. After reviewing the documents ourselves pursuant to our de novo review, we agree with Hedayati's contention that Auto

Club failed here to follow its own guidelines related to the handling of excess policy claims.

Auto Club moved for summary judgment on Hedayati's claim for breach of the covenant of good faith and fair dealing in its policy with its insured. The trial court considered the parties' respective moving and opposition papers, and held a hearing on the motion. The court then granted the motion, finding that "[d]efendant has shown that it did not commit any acts that would constitute a breach of the covenant of good faith and fair dealing . . . ." The court held Auto Club "never rejected any of plaintiff's settlement demands." It concluded as a factual matter, "[t]o the contrary, defendant offered plaintiff its $25,000 policy limits by letter dated October 31, 2012 (Exhibit 5) before plaintiff ever made a demand."

As to Hedayati's demand, the court explained it "must be guided by how case law defines bad faith" and agreed with "the definition [of bad faith] as an unreasonable refusal to accept a settlement offer within policy limits." The court, however, reiterated its conclusion that Auto Club "never refused any of plaintiff's policy limits settlement demands." According to the court, "All plaintiff has shown is that defendant failed to respond by plaintiff's self-imposed, arbitrary deadline to a demand defendant received the day before Thanksgiving for not just $25,000, but also for a signed declaration from the insured attesting to certain facts."

In reaching its conclusion, the trial court seems to have focused more on plaintiff's conduct than that of Auto Club. The court stated, "Although plaintiff's deadline [to accept the policy limits settlement offer] was the following Tuesday after Thanksgiving, plaintiff inexplicably required the response to be sent by UPS or FedEx overnight delivery, not by fax or courier, meaning that it had to be sent the Monday after Thanksgiving." The court found "there was no real reason for the mega-short deadline" and, therefore, Auto Club's response—or lack thereof—was immaterial.

9

In essence, the court found that no reasonable trier of fact could conclude Auto Club's conduct in failing to meet the clear terms of Hedayati's settlement offer and secure a release constituted a breach of its duties to Vanwyk under his liability policy. In other words, as a matter of law, the trial court found Auto Club did not violate its implied promise to Vanwyk to handle policy claims with good faith and fair dealing regarding his interests. We disagree with this analysis.

**DISCUSSION**

Hedayati challenges the trial court's summary judgment ruling. "A motion for summary judgment should be granted if the submitted papers show that 'there is no triable issue as to any material fact,' and that the moving party is entitled to judgment as a matter of law." (*Myers v. Trendwest Resorts, Inc*. (2007) 148 Cal.App.4th 1403, 1409.) The moving party bears the burden of showing the plaintiff "'"has not established, and cannot reasonably expect to establish,"'" the elements of her cause of action. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*).)

On appeal, "'"the evidence must be incapable of supporting a judgment for the losing party in order to validate the summary judgment."'" (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 308.) Our review is de novo. "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

Hedayati contends the trial court erred in concluding as a matter of law that Auto Club did not breach its covenant of good faith and fair dealing it owed to Vanwyk. "The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To

10

fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests.'" (*Wilson*, *supra*, 42 Cal.4th at p. 720.)

Good faith is generally for the trier of fact to resolve, unless, "from uncontroverted evidence, a reasonable man following the law can draw but one conclusion on the issue." (*Davy v. Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 400.) Put another way, "'the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, [but] becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence.'" (*Pinto v. Farmers Ins. Exchange* (2021) 61 Cal.App.5th 676, 689 (*Pinto*). "An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions." (*Wilson*, *supra*, 42 Cal.4th at p. 723.)

"Bad faith" in this context does not require "that the party's conduct be dishonest." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372-373.) "'[T]he critical issue [is] the reasonableness of the insurer's conduct under the facts of the particular case.'" (*Pinto*, *supra*, 61 Cal.App.5th at p. 687.) An insurer that pays the full amount of its policy may be liable for breach of the implied covenant of good faith and fair dealing if improper claims handling causes detriment to the insured. (*Fleming v. Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 37-38.)

Good faith and fair dealing requirements obligate insurers to make reasonable efforts to settle claims against their insureds. (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 401 (*Kransco*); *Lehto v. Allstate Ins. Co.* (1994) 31 Cal.App.4th 60, 67-68.) It is well established that this duty requires the insurer to accept a settlement demand within policy limits when there is a substantial likelihood the claimant will obtain a judgment exceeding the insured's policy limits. (*Kransco*, at p. 401.)

11

The duty to settle arises because of the inherent conflict of interest created by the different risks faced by the insurer and the insured. If the claim is not settled and instead proceeds to trial and a judgment, the insurer faces only limited liability because the insured is generally responsible for amounts exceeding the policy limits. (*Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 869-870, 873-874 (*Merritt*).) Conduct by the insurer which exposes the insured to this risk, and which may be financially catastrophic for the insured, will not be rewarded. (*Ibid.*; see also *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 941.) To minimize this conflict, the implied covenant "requires the [insurer] to consider in good faith the interests of the [insured] equally with its own and evaluate settlement offers within policy limits as though it alone carried the entire risk of loss." (*Merritt, supra*, at p. 871; *Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718, 724-725 (*Hamilton*).)

An insurer that unreasonably fails to accept a settlement demand that falls within the policy limits of its insured acts in bad faith. Such an insurer is liable for any damages caused by its breach of the duty to settle, including the full amount of any judgment against the insured that exceeds the policy limits. (*Hamilton*, *supra*, 27 Cal.4th at p. 725; *Kransco*, *supra*, 23 Cal.4th at p. 401.) This liability is not a windfall to the insured; it "will not give the insured any additional advantage but merely place him in the same position as if the contract had been performed." (*Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661.) The rule thus provides to the insured "as nearly as possible the equivalent of the benefits of the contract." (*Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 469.)

An insurer may also be liable if it breaches other duties owed to the insured, such as the duty to investigate or the duty to communicate, and that breach prevented the insurer from settling the claim within policy limits. (*Boicourt v. Amex Assurance Co.* (2000) 78 Cal.App.4th 1390, 1392, 1399-1400 (*Boicourt*).) In *Boicourt*, the insurer's failure to communicate with its insured prevented a possible settlement

12

within policy limits and therefore subjected it to potential liability for an excess judgment. (*Ibid.*) This rule prevents an insurer from benefitting from breach of an underlying duty that would otherwise shield it from liability for breach of the duty to accept a reasonable settlement demand. (*Safeco Ins. Co. of America v. Parks* (2009) 170 Cal.App.4th 992, 1008-1009 (*Parks*).)

Upon our de novo review, ""[i]n practical effect, we assume the role of a trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary [judgment].""" (*California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 631.) ""Regardless of how the trial court reached its decision, it falls to us to examine the record de novo and independently determine whether that decision is correct.""" (*Ibid.*) The plaintiff's complaint frames the issues for summary judgment. ""[A] motion for summary judgment must be directed to the *issues raised by the pleadings*.""" (*Lockhart v. County of Los Angeles* (2007) 155 Cal.App.4th 289, 304, original italics; *Perkins v. Howard* (1991) 232 Cal.App.3d 708, 712.)

Here, Hedayati specifically alleged in her complaint that Auto Club breached its duty to communicate with its insured. As a result, she claimed Vanwyk "was unreasonably and unnecessarily exposed to a judgment far in excess of [his policy's] bodily injury limits." Hedayati alleged Auto Club failed to communicate her November 20 policy limits settlement offer to Vanwyk. As such, he had no opportunity to "appreciate the importance of duly and timely doing" anything "necessary to accept" the offer.

A liability insurer has a duty to communicate to its insured any settlement offer that could affect the insured's interests, particularly where action is required by the insured to secure the settlement. (*Heredia v. Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1360.) Here it is undisputed that Auto Club failed to convey Hedayati's November 20 settlement offer to Vanwyk. Auto Club nonetheless sought to support its summary judgement motion by characterizing this failure as reasonable under

13

the circumstances.  Such an approach will almost inevitably raise contested issues of fact, as it did here.

Auto Club did not address Hedayati's failure-to-communicate theory of liability with any evidence in its summary judgment motion.  Among other things, Auto Club failed to establish that Vanwyk was out of town, had no cellular phone or landline, no access to e-mail, or was otherwise incommunicado, nonresponsive, or could not be contacted by Auto Club between November 21 and November 26, 2012, to convey and discuss Hedayati's settlement offer.  Despite his apparently keen interest in settling the case and obtaining a release, Vanwyk therefore had no opportunity to do what *he* could to secure a settlement on the terms offered.  In light of his previous declaration (which Auto Club never provided to Hedayati's attorney), it appears all that was missing on November 20 that Vanwyk could have supplied to meet Hedayati's settlement demand was his declaration that he had no assets (a fact he had already personally confirmed with Auto Club).  In any event, Auto Club presented no facts, failed to discuss, and did not attempt to refute in any way in its summary judgment motion Hedayati's good faith and fair dealing claim based on its alleged failure to communicate with its insured.

If the defendant does not address an issue in a motion for summary judgment that has been raised in the plaintiff's complaint, it fails to meet its initial burden to show the plaintiff's action has no merit; the motion therefore fails to shift the burden to the plaintiff to oppose summary judgment.  (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 940, 945 (*Wilton*).)  That is what occurred here.

Where "the motion ha[s] not addressed all theories in the complaint . . . summary judgment should not have been entered."  (*Wilton*, *supra*, 144 Cal.App.4th at p. 947.)  Auto Club did not move for summary adjudication of individual theories or claims Hedayati advanced (Code Civ. Proc., § 437c, subd. (f)(1)); Auto Club moved for summary judgment.  We therefore need not address Auto Club's challenges to Hedayati's other theories asserting breach of the covenant of good faith and fair dealing.  When a

14

summary judgment motion "did not negate theories of [defendant's] liability, the trial court should have held that [the defendant] failed to carry [its] initial burden and stopped there." (*Wilton*, at p. 945.) When, as here, the defendant "did not move in the alternative for summary adjudication of specified issues, we will not address whether [it] may have prevailed on some issues in this case." (*Id.* at p. 949.)

Auto Club did argue below, and asserts again on appeal, that given the Thanksgiving holiday, the week-long time limitation Hedayati set for acceptance of her settlement offer was unreasonable as a matter of law. Auto Club maintains that its failure to accept the offer therefore cannot be deemed unreasonable. But Auto Club offered no evidence in its motion that it made any effort to contact its insured before, during, or after the holiday. To the contrary, as we noted above, Auto Club violated its own internal guidelines regarding the handling of an excess policy claim such as this.

By their nature, issues related to the "reasonableness" of a party's conduct often implicate disputed issues of fact. Whether an insurer breached its duty of good faith and fair dealing to its insured in the claims-handling process turns on the particular facts of the case. (*Pinto*, *supra*, 61 Cal.App.5th at p. 688-689.) Here, a reasonable trier of fact could find both as to Auto Club's duty to communicate with its insured and its duty to accept and effectuate reasonable settlement offers that—in light of the history of how this claim had been handled—the deadline imposed by the November 20 settlement offer was not unreasonable.

According to Hedayati, each time her attorney tried to obtain information necessary for settlement, Auto Club put him off. It did so despite recognizing at the outset the need to "move quickly," and the fact that "our $25k Limit is Gone." As a result, a reasonable trier of fact could find that by November 20 Hedayati's counsel had good reason to draw "a line in the sand" with his tight settlement conditions.

In focusing on the short work week surrounding the Thanksgiving holiday, Auto Club ignores that Hedayati's complaint and the foregoing evidence produced for

15

summary judgment place her settlement offer into a larger context. She alleged Auto Club's breaches of its covenant of good faith and fair dealing included "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the policy," and failing to do what was necessary "to effectuate a prompt . . . settlement" that would "protect its insured's interests." These communications included not only those by Hedayati's attorney seeking information relevant to settlement, but also communications by Vanwyk indicating his interest in settling.

Auto Club learned from Vanwyk during its very first contact with him that he was "unemployed and living with his parents," had no other insurance, did "not own anything" and had no assets, including "no real property." As if that did not make his circumstances clear enough, Vanwyk later expressly communicated to Auto Club his interest in obtaining a release against excess liability. The prospect of a liability finding in excess of Vanwyk's policy limits seems to have been abundantly clear from the outset, as Auto Club recognized in writing almost from day one even if Vanwyk bore only a "percentage of liability." Indeed, Auto Club's own investigation revealed the likelihood that the value of Hedayati's claim would far exceed Vanwyk's policy limits when he admitted that eyewitnesses told him he ran a red light. Auto Club prevented Vanwyk from further pressing for a release by inaccurately telling him Hedayati was not interested in signing one. Auto Club then failed to convey Hedayati's settlement offer to Vanwyk.

Auto Club acknowledged during the depositions of its agents that it was aware of the types of information claimants require before agreeing to settle a catastrophic injury claim like Hedayati's for Vanwyk's meager policy limits. That information included written proof of the policy limits, and declarations by the insured that there was no other insurance or recourse available. Yet, by the date it received Heyadati's formal settlement offer, Auto Club had never disclosed any of this information—despite repeated requests from Hedayati's lawyer and Vanwyk's specific

16

authorization which included relevant declarations he had already signed at Auto Club's behest.

A trier of fact could conclude Hedayati's lawyer reasonably concluded that nothing might focus Auto Club's attention to provide necessary disclosures like a short settlement deadline. So he made a seven-day demand. Here, whether a seven-day demand was reasonable is for the trier of fact to determine; a short time limit attached to a settlement demand may or may not be reasonable under the circumstances of a given case. (*Graciano v. Mercury General Corp.* (2014) 231 Cal.App.4th 414, 42 (*Graciano*).) Auto Club already had in its possession all but one piece of information requested by Hedayati. The only thing missing was Vanwyk's attestation that he had less than $200,000 in assets—a fact Auto Club already knew based on Vanwyk's earlier statement which was documented in the Club's claims notes.

We express no opinion here on the ultimate merits of Hedayati's bad faith claim. As Auto Club correctly observes, "A facially reasonable [settlement] demand might go unaccepted due to no fault of the insurer, for example if some emergency prevents transmission of the insurer's acceptance." (*Pinto*, *supra*, 61 Cal.App.5th at p. 688.) Moreover, "failing to accept a reasonable settlement offer does not necessarily constitute bad faith." (*Ibid.*) "[M]ere errors by an insurer in discharging its obligations to its insured '"does not necessarily make the insurer liable in tort for violating the covenant of good faith and fair dealing; to be liable in tort, the insurer's conduct must also have been unreasonable."'" (*Graciano, supra,* 231 Cal.App.4th at p. 425.)

A jury could conceivably find the foregoing principles applicable based on the explanation Auto Club offered at summary judgment for not accepting Hedayati's time-sensitive settlement offer. Auto Club presented evidence to the trial court in support of its summary judgment motion that suggested the person responsible for retrieving express mail packages from the security desk to which they were delivered called in sick on the Wednesday before Thanksgiving. Auto Club's internal documentation showed it

17

maintained "no list" of this person's responsibilities for those covering for her to execute and that "none of the clerical staff remembered to call/visit security" until Tuesday, November 27th.[1] That day, someone at Auto Club finally "remembered to check" for express mail, retrieved Hedayati's envelope, and left it for Meraz, the casualty team manager, who "had been here earlier in the day" but apparently went to a dental appointment that afternoon. Thus, he "did not see the package until the next morning," Wednesday, November 28th. This was a week after the offer had been delivered and the day after Auto Club's opportunity to accept it for its insured's benefit expired. Perhaps a jury will find such evidence persuasive.

On the other hand, Auto Club presented no evidence to demonstrate any sort of extraordinary circumstance or emergency was responsible for Auto Club's failure to accept Hedayati's offer by the November 27 deadline and, as we have already observed, Auto Club failed to follow its own internal guidelines regarding the handling of an excess policy claim such as this. A jury might therefore conclude it was not a "mere error" or otherwise excusable conduct that created the insurer's lost opportunity to settle the matter within Vanwyk's policy limits. The trier of fact could instead conclude that Auto Club's established procedure—or lack thereof—for handling employee absences and fielding time sensitive settlement offers unreasonably exposed its insured to an excess judgment. In this regard, the jury could consider the fact that Auto Club apparently maintained no processing safeguards to ensure that it addressed serious claims on a timely basis.

The jury could also consider that, once it opened its mail, Auto Club made no immediate effort to meet the requirements of Hedayati's offer. Auto Club conveyed

---

[1] The trial court overruled Hedayati's objection to this evidence on hearsay and other grounds. Because the evidence does not establish Auto Club was entitled to summary judgment as a matter of law, we need not determine whether the trial court's ruling was erroneous, as Hedayati claims on appeal.

18

no unequivocal intent to immediately settle what was clearly an excess policy claim in its insured's best interests. To the contrary, according to Hedayati's attorney, on November 28 Auto Club sought more time to "respond" to the expired offer, without stating any intent to settle the claim on the proposed terms. While Hedayati's deadline had already passed, that did not absolve Auto Club of its good faith and fair dealing obligation to secure for Vanwyk the benefits of his policy. "[A]n injured party's unilateral selection of a deadline does not conclusively govern whether a *later* tender of policy limits would have been *untimely . . . .*" (*Graciano*, *supra*, 231 Cal.App.4th at p. 435, original italics.)

Auto Club never told Hedayati's attorney it would have accepted her settlement offer but for what it later suggested at summary judgment was a clerical error. Nor did it proffer evidence of an intent to settle on the terms offered. Instead, the evidence was subject to various interpretations, including that the Club's intent was to try to further negotiate the claim, or that it treated the settlement opportunity with a cavalier disregard for its insured's interests.

Similarly, disputed facts precluded summary judgment in Auto Club's favor based on its claim that the Club offered Vanwyk's policy limits to settle the case both before and after Hedayati's lapsed offer. The initial Auto Club adjustor claimed he telephoned Hedayati's attorney early on the morning of October 19, 2012, to offer the $25,000 policy limit; Hedayati's attorney directly contradicted this, testifying no such offer was made and the adjustor never disclosed the policy limits despite his repeated requests.

The trial court found that the subsequent casualty adjustor offered the $25,000 policy limits in a letter to the attorney on October 31, 2012. After our de novo review, however, we cannot say as a matter of law that this fulfilled Auto Club's good faith obligations to its insured. The insurer must make reasonable efforts to settle potential excess judgments within policy terms when possible. (E.g., *Kransco*, *supra*, 23 Cal.4th at p. 401.) A reasonable trier of fact could conclude the October 31 letter at

19

best was an invitation to continue negotiating a settlement. This is particularly true since that letter omitted essential documentation Hedayati's lawyer required before agreeing to any settlement.

Auto Club relies on *Graciano* to claim a "safe harbor" cloak of immunity based on its October 31 offer; that reliance is misplaced. There, the reviewing court held "at a minimum that the insurer *has* satisfied its duty to seek to settle in protection of its insured when, 'in light of the time limitation which plaintiff had placed on her offer' [citation], the insurer tenders its full policy limits *within* the time limits imposed by an injured party's demand letter." (*Graciano*, *supra*, 231 Cal.App.4th at p. 435, original italics.) Auto Club reasons that because "the October 31 offer pre-dates [Hedayati's subsequent] unilateral November 27 deadline, . . . it was timely as a matter of law." Auto Club argues that what it labels "the *Graciano* 'safe harbor' for timely tenders" is so broad that it applies even when the insurer, as in *Graciano*, "failed to satisfy the claimant's various conditions, such as providing a copy of the policy declarations page and delivering the settlement check." (Citing *Graciano*, at pp. 420-423.)

We are not persuaded. First, *Graciano* did not hold that an insurer need not respond to documentation requests on which a settlement offer is conditioned; rather, the court considered only the timeliness of the insurer's response. It is axiomatic that cases are not authority for propositions not considered. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 614.) Second, Auto Club misstates the timeline of events by characterizing its October 31 letter as timely and responsive to a settlement offer that Hedayati had not yet made.

Finally, the *Graciano* court considered on the question of timeliness whether the insurer had done "'all within its power to effect a settlement'" "'by offering the policy limits *in exchange for a release* . . . .'" (*Graciano*, *supra*, 231 Cal.App.4th at p. 435, italics added.) The importance of a release as an essential settlement term illustrates that "'the reasonableness of an insurer's claims-handling conduct'" must be

20

assessed "'based on the *whole* record.'" (*Pinto*, *supra*, 61 Cal.App.5th at p. 689, original italics.) In its October 31 letter Auto Club gave no indication of the scope of the release it would demand in exchange for Vanwyk's $25,000 policy limits. That did not become clear until mid-December 2012, a further delay that a jury reasonably could consider as evidence that at every point Auto Club claims it was ready to settle, in fact it was not. Instead, it was still negotiating. Such conduct was arguably inconsistent with Auto Club's good faith obligation to its insured. The reasonableness of all these actions is fundamentally a factual question to be resolved at trial.

A reasonable trier of fact could also conclude that Auto Club erred when it relied on its outside counsel's communications with Hedayati's attorney in mid-December 2012. The attorney claimed Auto Club could "do no more" than it already had to "protect the[] insured." Counsel sent Hedayati's attorney a release and other documents at that time, with the release discharging Vanwyk's representatives and insurance carriers from any and all claims, along with Vanwyk. Unlike Auto Club's standard release, however, this release also included a confidentiality clause. While the attorney's letter included a declaration of coverages and limits for Vanwyk's insurance policy, and Vanwyk's declaration that he had less than $200,000 in assets, it still did not include, according to Hedayati, a hard copy of the policy which she had so consistently demanded.

The release also required Hedayati to affirm that no promise, representation or agreement had been made *that was not expressed in the release*, which could be construed to prevent Hedayati from relying on Vanwyk's declaration or the policy limits declaration page. Under all of these circumstances, a reasonable trier of fact could conclude Auto Club's counteroffer to settle the matter through its outside counsel was not reasonably calculated to obtain Hedayati's assent.

Quoting from federal cases, Auto Club suggests that "to breach the implied covenant of good faith and fair dealing, the insurer must unreasonably *refuse* to settle."

21

(*Grayson v. Allstate Ins. Co.* (C.D.Cal. 2014) 2014 U.S. Dist. LEXIS 248622, *26-27, italics added; *McDaniel v. Government Employees Ins. Co.* (9th Cir. 2017) 681 Fed.Appx. 614, 617 ["an insurer's negligence is insufficient to constitute an 'unreasonable refusal' to accept a settlement offer"].)  But the well-established rule under California law remains clear:  "the critical issue being the reasonableness of the insurer's conduct under the facts of the particular case." (*Wilson, supra,* 42 Cal.4th at p. 723.) Implicit in the rule which requires timely settlement efforts is that untimely ones are tantamount to an unreasonable refusal to settle.  (See, e.g., *Graciano*, *supra*, 231 Cal.App.4th at p. 435.)  Obstructing or preventing the very settlement an insurer itself proposes may constitute a bad faith refusal to settle.  (See, e.g., *Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508, 521-522.)

Finally, Auto Club argues any delay in initially engaging with Hedayati's attorney before the November 20 offer expired was reasonable given that Hedayati was in a coma throughout this time.  As a result, Auto Club had no assurance the attorney was authorized to negotiate on her behalf.  Hedayati counters that Auto Club's claim notes reflected that it corroborated the brother who spoke for Hedayati's family in news articles was the same brother who retained the attorney.

The fact that Auto Club treated Hedayati's attorney as her authorized representative for settlement purposes undercuts its new claim that it reasonably could have declined to do so.  Moreover, the offer expressly authorized Auto Club to condition its acceptance on proof of who was entitled to act as Hedayati's guardian or conservator to settle her claims and execute a release.  A jury could conclude that once Auto Club indicated a potential readiness to settle the matter with the attorney acting as Hedayati's representative, its duty of good faith and fair dealing to its insured obligated it to carry out those efforts in a reasonable manner.  At the end of the day, that question, like all the factual issues raised by this evidence, must be resolved by a jury.

## DISPOSITION

The trial court's summary judgment ruling, and the judgment based on it, are reversed.  Hedayati is entitled to her costs on appeal.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.